1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>     v.<br><br>JOSEPH MICHAEL QUINCY<br>JEFFERSON,<br><br>                          Defendant. | CASE NO. 2:23-cr-00109-LK<br><br>ORDER REGARDING MOTIONS<br>TO DISMISS THE INDICTMENT<br>AND MOTION TO SEAL |

16

17

18

19

20

21

22

23

24

     This matter comes before the Court on Defendant Joseph Michael Quincy Jefferson's Motions to Dismiss the Indictment, Dkt. No. 56, or in the alternative, to Dismiss or Cure the Duplicitous Indictment, Dkt. No. 57, and his motion to seal, Dkt. No. 66. For reasons discussed below, the Court denies in part and defers in part the motion to dismiss the indictment, denies as moot the motion to dismiss or cure the duplicitous count, and grants the motion to seal. The Court also orders the parties to submit supplemental briefing as described below.

## I.    BACKGROUND

     The Government plans to try Jefferson before a jury for one count of Assault by

1   Strangulation in violation of 18 U.S.C. §§ 113(a)(8) and 1153(a). Dkt. No. 13. At the time of the

2   alleged offense, Jefferson lived on the Lummi Indian Reservation in a residence he shared with his

3   intimate partner, "Jane Doe." Dkt. No. 61 at 2. The Government alleges that on the morning of

4   April 8, 2023, Jefferson and Doe got into an argument during which Jefferson physically assaulted

5   Doe and strangled her. *Id.* The same day, Jefferson was charged in Lummi Tribal Court with

6   "Assault and Battery Second Degree – Domestic Violence," "Assault and Battery Third Degree –

7   Domestic Violence," "Harassment – Domestic Violence," "Resisting Lawful Arrest," and

8   "Harassment." Dkt. No. 23 at 3;[1] *see also* Lummi Nation Code of Laws, Sections 5.01.020,

9   5.01.080, 5.07.040, 5A.01.040(b)–(c). There is also an active protection order in tribal court

10  prohibiting Jefferson from having contact with Jane Doe. Dkt. No. 23 at 3.

11         On July 5, 2023, a federal grand jury indicted Jefferson for Assault by Strangulation in

12  violation of 18 U.S.C. §§ 113(a)(8) and 1153(a). Dkt. No. 13. Trial is scheduled for September 30,

13  2024. Dkt. No. 50. Jefferson filed several pretrial motions, including the instant motions to dismiss.

14  Dkt. Nos. 55–57.

15                          **II.   DISCUSSION**

16  **A.    Motion to Dismiss for Failure to Preserve Evidence**

17         Jefferson argues that the Government's failure to preserve key pieces of evidence amount

18  to a Fifth Amendment due process violation. Dkt. No. 56 at 4. The Court first observes that the

19  United States Constitution—including the Fifth Amendment—does not apply to Indian tribes.

20  *Talton v. Mayes*, 163 U.S. 376, 384 (1896); *see also United States v. Bryant*, 579 U.S. 140, 149

21  (2016); *Seneca v. Great Lakes Inter-Tribal Council, Inc.*, No. 22-2271, 2023 WL 4340699, at *2

22

23  ───────────────
    [1] The initial Pretrial Services Report in this case lists these charges as Homicide, Harassment, Intimidating Witness,
    and Resisting Arrest. Dkt. No. 22 at 4. However, the Supplemental Pretrial Services Report updated those charges

24  after "Lummi Tribal Court records were obtained" that "reflect[ed] the charges filed via Complaint in Lummi Tribal
    Court." Dkt. No. 23 at 2–3.

ORDER REGARDING MOTIONS TO DISMISS THE INDICTMENT AND MOTION TO SEAL - 2

1    (7th Cir. July 5, 2023). The process owed to Jefferson by LNPD instead stems from the Indian

2    Civil Rights Act, which prohibits a tribe from "deny[ing] to any person within its jurisdiction the

3    equal protection of its laws or depriv[ing] any person of liberty or property without due process of

4    law," 25 U.S.C.A. § 1302(a)(8); from the Lummi Nation Constitution, which contains the same

5    prohibition, Lummi Constitution and Bylaws, Art. VIII, Section 8 (2016); and from the Lummi

6    Nation Code of Laws. *Cf. United States v. Scott*, No. CR-19-30-GF-BMM, 2021 WL 170787, at

7    *1 (D. Mont. Jan. 19, 2021) ("The exclusionary rule applies in federal court to violations of the

8    Indian Civil Rights Act's Fourth Amendment counterpart."). The Court assumes without deciding

9    that Fifth Amendment jurisprudence applies to Jefferson's motion as it relates to LNPD's conduct.

10        Jefferson argues that the Court should either dismiss the indictment or hold an evidentiary

11   hearing based on LNPD's failure to collect potentially useful or exculpatory evidence, including a

12   bread knife Doe brandished during the incident, blood on Jane Doe's hand,[2] evidence underneath

13   Jane Doe's fingernails, and a scratch on Jefferson's neck. Dkt. No. 56 at 3–6; Dkt. No. 67 at 1.

14   Jefferson argues that LNPD's failure to preserve this evidence deprives him of the opportunity to

15   have the knife examined for evidence of his blood or DNA, and to present the knife to the jury. *Id.*

16   at 3–4.

17        A criminal defendant moving for dismissal based on a failure to preserve materially

18   exculpatory evidence must make a two-pronged showing that (1) the evidence possessed

19   exculpatory value "that was apparent before [it] was destroyed" and (2) it was "of such a nature

20   that the defendant would be unable to obtain comparable evidence by other reasonably available

21   means." *California v. Trombetta,* 467 U.S. 479, 489 (1984). When the evidence at issue is not

---

[2] Jefferson argues for the first time in his reply brief that law enforcement knew of, yet failed to collect, this blood. Dkt. No. 67 at 1, 3. Jefferson explains that he was not "made aware of" the officer's "report of observing blood on [Doe's] hand" until August 26, 2024, and then accuses law enforcement of "purposely avoid[ing] collecting and disclosing the existence of the most basic evidence" without explaining how he was made aware of the blood evidence or why it amounts to purposeful avoidance. *Id.* at 3.

materially exculpatory but is still "potentially useful," a failure to preserve it "does not violate due process '*unless a criminal defendant can show bad faith*'" on the part of the government. *Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004) (quoting *Arizona v. Youngblood,* 488 U.S. 51, 58 (1988)).

     1.  <u>The Parties Have Not Provided Proper Evidentiary Support</u>

Local Criminal Rules 12(b)(1) and (2) require parties to "file copies of all affidavits and photographic or documentary evidence presented in support of" the motion or opposition when "consideration of facts not appearing of record" is required. *See also Cohen v. United States*, 378 F.2d 751, 761 & n.21 (9th Cir. 1967). However, both parties rely on evidence that is not in the record to support their positions without providing accompanying declarations or exhibits. *See, e.g.*, Dkt. No. 56 at 2–3, 6 (relying on Officer Thomas Granger's written report and associate medical examiner Micheline Lubin's report); Dkt. No. 62 at 3 (appearing to rely on Officer Granger's report); *id.* at 5 (relying on Dr. Lubin's report); *id.* at 7 n.3 (suggesting law enforcement acted within "normal police practices" without quoting to or providing the relevant practices); Dkt. No. 67 at 3 (quoting Officer Daniel Galt's report).

Notably, Jefferson did not produce any exhibits until his reply brief. Dkt. Nos. 67-1–67-3, 68.[3] Even then, the reply brief lacks citations to certain of those exhibits. *See, e.g.*, Dkt. No. 67 at 7 (making various assertions regarding law enforcement conversations on the day of the incident without citing to any supporting evidence). It is not the Court's job to locate the relevant exhibits for Jefferson. *United States v. Renzi*, 651 F.3d 1012, 1030 (9th Cir. 2011) (it is incumbent on the defendant "to bring to our attention those specific exhibits that cause him concern"). And at least one of the exhibits attached to the reply brief contradicts Jefferson's earlier characterization of the evidence in his motion. *Compare* Dkt. No. 68 at 2 (picture taken by Officer Granger showing a

---

[3] Many of the arguments Jefferson relegated to his reply brief could have—and should have—been raised in his motion.

sizeable bruise on Jane Doe's left hand and an injury or mark of some sort on her ring finger), *with* Dkt. No. 56 at 2 (arguing that Officer Granger's photos of Jane Doe's hands and fingernails "showed nothing out of the ordinary"). These issues raise doubts regarding whether Jefferson's motion is "sufficiently definite, specific, detailed, and nonconjectural" to enable the Court to conclude that contested issues of fact are in issue. *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986).

### 2.   The Evidence Is Not Materially Exculpatory

Here, the evidence at issue does not possess clear exculpatory value. "Evidence is exculpatory if it is 'favorable to an accused' and 'material either to guilt or to punishment.'" *United States v. Hendrix*, No. CR19-0024-JLR, 2019 WL 6879605, at *3 (W.D. Wash. Dec. 17, 2019) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "Exculpatory evidence is material if its introduction at trial would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Id.* (citing *Comstock v. Humphries*, 786 F.3d 701, 711 (9th Cir. 2015)). For evidence to be materially exculpatory, its exculpatory nature must be apparent. *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013). If the item's exculpatory value was apparent before it was lost or destroyed, and was of such a nature that the defendant could not obtain comparable evidence, the failure to preserve evidence constitutes a due process violation. *Trombetta*, 467 U.S. at 489.

Jefferson contends that "[w]ithout the knife, pictures of the injuries, and DNA evidence related to the knife and Jane Doe's fingernails, the government deprived Mr. Jefferson of the ability to examine and test those items in a way that would have been favorable to his defense, including a claim of self-defense." Dkt. No. 56 at 6. The Government responds that, "[a]t most, the unpreserved evidence *could have been* exculpatory, which is insufficient to satisfy constitutional materiality." Dkt. No. 62 at 7 (emphasis added). The Court agrees with the Government.

As best as the Court can tell from the record before it, the alleged strangulation and reaction from law enforcement unfolded as follows. On April 8, 2023, at approximately 1:00 a.m., Jane Doe and Jefferson got into an argument in their dining room. Dkt. No. 1 at 2. At some point during the argument, Jane Doe brandished a knife. Dkt. No. 56 at 2. Jefferson punched Doe on the right side of her face, shoved her into a shelving unit, and tackled her to the ground. Dkt. No. 1 at 2. Doe landed face down on the floor, and Jefferson proceeded to strangle her by putting his arm around her neck and applying pressure. *Id.* Doe scratched and fought to get Jefferson off of her, but lost consciousness. *Id.* at 2–3. When Jefferson stopped strangling her and she regained consciousness, Doe ran outside and called a friend, who drove Doe to the LNPD station. *Id.* at 3–4.

Officer Daniel Galt interviewed Doe, and when he asked to look at her hands, he saw blood on her left hand between her fingers. Dkt. No. 67 at 3. That blood was not preserved by LNPD. *Id.* Officer Granger also interviewed Doe and recorded his observations of her injuries, including petechial hemorrhaging in her eyes and on her upper cheek areas, an elliptical-shaped red mark by her left clavicle, a small scratch on her left shoulder, red marks on the front and left side of Doe's neck, and bruising on the front of Doe's neck under her chin. Dkt. No. 62 at 3. Officer Granger took numerous photographs of Doe to document her appearance and injuries. *Id.* One photo of her left hand shows a sizeable bruise, and there may be dried blood on her ring finger, but it is unclear whether there is blood between her fingers as reported by Galt; the spaces between her fingers are obscured by shadows. Dkt. No. 68 at 2. Officer Granger did not take swabs from underneath Doe's fingernails. Dkt. No. 62 at 3. During his interview with Doe, Officer Granger learned that Doe brandished a knife during the argument. *Id.* at 2.

A friend then drove Doe to PeaceHealth United General Medical Center in Sedro-Woolley, where Doe underwent a forensic examination and received treatment for her injuries until around

9:00 a.m. *Id.* at 3. Although several medical tests were performed, DNA swabs of Doe's fingernails were not taken. *Id.* at 4.

That same morning, LNPD officers obtained a tribal search warrant and arrest warrant for Jefferson. *Id.* at 3. They located Jefferson at the residence where the altercation took place, arrested him, and transported him to Whatcom County Jail.[4] *Id.*; Dkt. No. 1 at 3. While transporting Jefferson, Officer Granger noticed a one- to two-inch long scratch mark on Jefferson's neck behind his left ear. Dkt. No. 1 at 3; Dkt. No. 56 at 2–3. He did not photograph it but documented the scratch in his police report. Dkt. No. 62 at 3; Dkt. No. 56 at 3. LNPD searched the residence pursuant to the tribal search warrant, but did not seize any knives. Dkt. No. 62 at 3; Dkt. No. 56 at 3.

Although Jefferson argues that a medical expert could have examined the injury to his neck to determine whether it was an offensive injury or defensive injury, and that, "[i]f given the opportunity to examine the knife and scratch, Mr. Jefferson could have proven that the knife was a potential source of his injury," Dkt. No. 56 at 4, speculation about a piece of evidence's possible—or even probable—exculpatory value is not sufficient. Take the knife and the blood on Doe's hand, for example. There are several possible scenarios had Jefferson tested them for blood: (1) Jefferson's blood is found on the knife or hand, (2) both Jefferson's and Doe's blood is found on the knife or hand, (3) only Doe's blood is found on the knife or hand, and (4) no blood is found on the knife. At best, a favorable result "could have" helped exculpate Jefferson, but at a minimum, scenarios (3) and (4) (with respect to the knife) would likely not have (and may even have further incriminated him). The same goes for the other two pieces of evidence the Government failed to preserve: a photograph of Jefferson's neck scratch and a DNA sample from Doe's fingernails. For

---

[4] Many tribes contract with county or municipal jails to house criminal defendants. *See* Wash. Rev. Code § 72.09.015, Official Notes.

both, the exculpatory value would have depended on lab testing or expert analysis. Neither the Government nor the defense knows what the results of such testing or analysis would have been. Furthermore, by the time Officer Granger saw the scratch on Jefferson's neck that he suspected was caused by a fingernail, Jane Doe had departed the area for treatment and testing in Sedro-Woolley, and it is unclear whether swabbing her nails would have been feasible at that point.

The best-case scenario for Jefferson is that the evidence *could* have been exculpatory, which does not meet the high threshold to show a due process violation under *Trombetta* and its progeny. *See, e.g.*, *United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) (lost digital-surveillance video did not violate a robbery defendant's due-process rights because "it [wa]s possible that [the video] would have further incriminated" the defendant); *United States v. Gamble*, 697 F. Supp. 3d 1045, 1056 (D. Nev. 2023) (exculpatory value not apparent where DNA evidence from the rifle merely could have exculpated defendant); *Crawford v. Foulk*, No. 2:14-CV-1464-EFB P (TEMP), 2016 WL 4120613, at *9 (E.D. Cal. Aug. 1, 2016) ("[T]he mere possibility that examination of the [missing] videotape may possibly have revealed exculpatory evidence is simply not enough to satisfy the *Trombetta* standards."). Furthermore, as the Government points out, "the evidentiary import of these items remains available for Jefferson's defense"—Jane Doe (and Jefferson, should he choose to do so) could testify as to the knife's role in the incident, the source of the scratch on Jefferson's neck, and the cause and extent of Doe's injuries. Dkt. No. 62 at 8.

The Court further observes that although neither Jefferson's federal public defender nor the Government was in a position to obtain evidence from the scene at or near the time of the incident, Dkt. No. 1 at 4–5 (reflecting Government involvement in the case around May 2023); Dkt. No. 4 (June 2023 appointment of federal public defender), it is unclear whether the Lummi prosecutor or public defender sought such evidence when tribal court charges were instituted.

Because Jefferson's motion is not sufficiently nonconjectural to enable the Court to

1    conclude that there are contested issues of fact with respect to this issue, he is not entitled to an

2    evidentiary hearing regarding whether a due process violation occurred under *Trombetta*. *Walczak*,

3    783 F.2d at 857. Jefferson's motion to dismiss on this basis is denied.

4          3.  <u>The Evidence Is Potentially Useful, But Jefferson Has Not Shown Bad Faith</u>

5          The parties focus most of their arguments on whether a due process violation occurred

6    under the standard established in *Youngblood*. As a threshold matter, Jefferson has met his burden

7    of showing the evidence at issue was "potentially useful." *See United States v. Zaragoza-Moreira*,

8    780 F.3d 971, 978 (9th Cir. 2015) ("Potentially useful evidence, as defined in *Youngblood*, is

9    'evidentiary material of which no more can be said than that it could have been subjected to tests,

10   the results of which might have exonerated the defendant.'" (quoting *Youngblood*, 488 U.S. at

11   57)). Each piece of potential evidence—the knife, a photograph of Jefferson's neck injury, the

12   blood on Jane Doe's hand, and the DNA under Doe's fingernails—could potentially support self-

13   defense. The Government concedes this point. Dkt. No. 62 at 10 ("the items in question could

14   conceivably have yielded potentially useful evidence to the defense").

15         Turning to the issue of bad faith, the Court considers several non-dispositive factors:

16   whether law enforcement was alerted to the value of the evidence, *United States v. Zaragoza-*

17   *Moreira*, 780 F.3d 971, 979 (9th Cir. 2015) (finding bad faith where officer was "repeatedly alerted

18   . . . to . . . the potential usefulness" of the video), the officer's knowledge that the evidence would

19   be destroyed and the credibility of the officer's explanation for not collecting the evidence, *see*

20   *Miller v. Vasquez*, 868 F.2d 1116, 1121 (9th Cir. 1989), evidence of malice or prejudice towards

21   the defendant, *see id.*, and whether the government acted with deliberateness, *see United States v.*

22   *Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (finding no bad faith where evidence was mishandled

23   rather than intentionally corrupted). Officers collecting evidence "in accord with their normal

24   practice" are presumptively acting in good faith. *See Trombetta*, 467 U.S. at 488.

ORDER REGARDING MOTIONS TO DISMISS THE INDICTMENT AND MOTION TO SEAL - 9

1        Jefferson does not argue or provide any direct evidence that LNPD Officer Granger or

2   anyone else from law enforcement harbored a specific animus against him, or that they deliberately

3   failed to preserve potentially useful evidence out of bias or animus. Instead, he argues that various

4   shortcomings in the investigation collectively support a finding of bad faith.

5        Jefferson first points to law enforcement's failure to collect the knife when it searched his

6   residence. Dkt. No. 56 at 4. It is unclear why law enforcement did not collect the knife; it is possible

7   that they searched for it and did not find it, but the record is undeveloped on this point. Jefferson

8   also avers that despite learning about the knife in his interview with Doe, Officer Granger's

9   "written report and sworn declaration contained in the application for a search warrant failed to

10  disclose that Doe escalated the situation by using a bread knife against Jefferson." Dkt. No. 67 at

11  4. But like many arguments that should have been raised in his motion, Jefferson makes this

12  argument for the first time in his reply brief. The Government therefore has not had an opportunity

13  to respond.

14       There are also unanswered questions regarding LNPD's failure to take a photograph of the

15  scratch on Jefferson's neck. While law enforcement was arresting Jefferson, officers discussed that

16  Doe "scratched him on the back of the ear" and that they should "try to find that." Dkt. No. 67-3

17  at 00:15 – 00:25 (recording). Although LNPD did document "a scratch mark on the left side of

18  [Jefferson's] neck behind his left []ear, about 1 to 2 inches long," they did not take a picture of it.

19  Dkt. No. 56 at 2–3. Jefferson contrasts the failure to take a single photograph of his injury with the

20  extensive photographic documentation of Doe's injuries. *Id.* at 3. As a result, Jefferson argues, he

21  could not have a medical expert examine the photograph opine on the nature and source of the

22  scratch—particularly to determine whether it was an offensive or defensive injury. *Id.* at 3–4. It is

23  unclear from the record whether LNPD deviated from policy or practice in failing to photograph

24  the scratch.

ORDER REGARDING MOTIONS TO DISMISS THE INDICTMENT AND MOTION TO SEAL - 10

Jefferson's other arguments appear specious at best based on the current record. First, his suggestion that Officer Granger's "incorrect[] identifi[cation of] petechial hemorrhaging in both of Doe's eyes" indicates animosity or bias, Dkt. No. 67 at 3–4, falls flat because the forensic nurse—who Jefferson does not allege harbored any bias—made the same identification, Dkt. No. 1 at 3. Similarly, his criticism of LNPD for not taking DNA swabs under Doe's fingernails is unpersuasive given the apparent timing of LNPD's discovery of Jefferson's injury. It is also notable that the forensic team at the hospital did not take swabs under Doe's nails.[5]

As for Jefferson's late-breaking complaints regarding Galt's report, without more information, the Court cannot draw any conclusions. Although Jefferson asserts that the blood observed by Galt "between [Doe's] fingers" on her left hand was suspiciously absent from a photo taken by Granger, Dkt. No. 67 at 3, the areas between Doe's fingers are obscured by shadows in the photo, Dkt. No. 68 at 2, and the timing between Galt's observation and Granger's photo is unclear from the record. And without the reports of Granger and Galt, the Court lacks the ability to meaningfully evaluate any differences in their observations. It is also unclear who is to blame (or if blame is warranted) for the fact that "the defense was not made aware of Galt's report . . . until August 26, 2024." Dkt. No. 67 at 3. Again, because Jefferson first raised the issue of the blood on Doe's hand and law enforcement obfuscation of the knife in his reply brief, the Government has not had an opportunity to respond.

The shortcomings described above do not mean that Jefferson has established contested issues of fact. Rather, neither party has submitted sufficient evidence to support its factual assertions. Accordingly, to be able to meaningfully evaluate Jefferson's bad faith argument and

---

[5] The Government avers that the failure to swab Doe's fingernails was not outside of normal practice, but does not supply any evidence supporting this proposition. Dkt. No. 62 at 7 n.3.

the Government's response to the same, the Court directs the parties to submit supplemental briefing as ordered below.

For the same reason, the Court defers its determination of Jefferson's alternative request for "remedial measures." Dkt. No. 56 at 4.

**B.      Motion to Dismiss or Cure Duplicitous Count**

Jefferson also moves under Federal Rule of Criminal Procedure 12(b)(3)(B)(i) to dismiss or cure the indictment because it erroneously joins two offenses with different state of mind requirements in the same count: strangulation and attempted strangulation. Dkt. No. 57 at 1. The Court denies this motion as moot considering the Government's subsequent election to proceed to trial solely on the strangulation theory of liability, Dkt. No. 60 at 1. The Government will not be submitting jury instructions regarding attempted strangulation. *Id.*

**C.      Jefferson's Motion to Seal**

Jefferson moves to seal Exhibit 2 to his reply in support of the motion to dismiss the indictment. Dkt. No. 66 (motion to seal); Dkt. No. 67 (reply in support). The motion is based on the Government labeling the Exhibit as protected under this Court's Discovery Protective Order. Dkt. No. 66 at 1 (citing Dkt. No. 21).

"Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" *Kamakana v. City & Cnty. Of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 & n.7 (1978)). Despite the public's presumptive right of access to documents in criminal proceedings, a document may remain under seal "when (1) sealing a document serves a compelling interest, (2) that is substantially likely to be harmed if the document is not sealed, and (3) there are no less restrictive alternatives for protecting the interest." *United States v. Parson*, No. 3:15-cr-05262-DGE, 2022 WL 558221, at *2 (W.D. Wash. Feb. 24, 2022) (citing *United*

1    *States v. Doe*, 870 F.3d 991, 998 (9th Cir. 2017)). The Court is satisfied that sealing the Exhibit

2    would serve a compelling interest in protecting Doe's privacy, and that there are no less restrictive

3    means of doing so. The motion to seal is granted.

### III.   CONCLUSION

5          For the reasons explained above, Jefferson's motion to dismiss the indictment is DENIED

6    IN PART and DEFERRED IN PART, Dkt. No. 56, his motion to dismiss or cure the duplicitous

7    count is DENIED as moot, Dkt. No. 57, and his motion to seal is GRANTED, Dkt. No. 66.

8          The parties are ORDERED to submit supplemental briefing as follows:

9    • Jefferson must first submit a supplemental brief of no more than 2,100 words

10       (1) providing (without any accompanying argument) any documents not currently in

11       the record that he relied on in his briefing to show bad faith; and (2) identifying with

12       greater specificity what "remedial measures" he requests in the event the Court denies

13       his motion to dismiss;

14   • The Government must then submit a supplemental brief of no more than 4,200 words

15       (1) addressing Jefferson's new arguments from his reply brief (a) regarding Officer

16       Galt's report; and (b) that law enforcement "successfully hid from the government that

17       Doe brandished a knife that night by sanitizing their reports and affidavits in a search

18       warrant and complaint," Dkt. No. 67 at 2; and (2) responding to Jefferson's

19       supplemental briefing regarding remedial measures. The Government should

20       also provide (without any accompanying argument) any documents not currently in the

21       record that the Government relied on in its briefing to rebut bad faith;

22   • Jefferson may then respond in no more than 2,100 words to the Government's brief on

23       the issues of (1) Officer Galt's report, and (2) remedial measures.

24   The parties should meet and confer on a briefing schedule, and once agreed, submit the

proposed schedule to the Court. The proposed briefing schedule should also address whether a continuance is necessary. Once the Court receives the supplemental briefing, it will determine whether an evidentiary hearing is warranted.

Dated this 9th day of September, 2024.

Lauren King
United States District Judge

ORDER REGARDING MOTIONS TO DISMISS THE INDICTMENT AND MOTION TO SEAL - 14