UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:23-cr-00109-LK |
| Plaintiff, | ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND DEFERRING IN PART THE MOTIONS TO SEAL |
| v. | |
| JOSEPH MICHAEL QUINCY JEFFERSON, | |
| Defendant. | |

This matter comes before the Court on the parties' supplemental briefing on Jefferson's motion to dismiss or for remedial measures, Dkt. Nos. 75, 82, and 86,[1] as directed by the Court's September 9, 2024 Order regarding the motions to dismiss and to seal, Dkt. No. 70. For the reasons set forth below, Jefferson's motion to dismiss or for remedial measures is denied. The Court also grants in part and defers in part the motions to seal.

---

[1] Jefferson filed a praecipe to correct Dkt. No. 86. *See* Dkt. No. 88. The corrected version is at Dkt. No. 88-1.

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND DEFERRING IN PART THE MOTIONS TO SEAL - 1

# I.   BACKGROUND

On August 19, 2024, Jefferson filed a motion to dismiss the indictment on due process grounds. Dkt. No. 56. In connection with his motion, Jefferson requested an evidentiary hearing and imposition of unspecified "remedial measures." Dkt. No. 56 at 4; Dkt. No. 67 at 1. In its September 9, 2024 Order, the Court deferred ruling on significant components of Jefferson's motion to dismiss the indictment because of various problems with the parties' briefing. Dkt. No. 70 at 4. Specifically, both parties relied on evidence not in the record for their arguments without providing supporting declarations or exhibits, in violation of the Local Criminal Rules. *Id.* Jefferson's reply also introduced new facts and arguments for the first time, depriving the Government of the opportunity to respond. *Id.* at 10–11. Jefferson also advanced a vague request for "remedial measures" without specifying what those were. *Id.* at 11–12; *see also* Dkt. No. 56 at 4. To avoid penalizing Jefferson for his counsel's mistakes, and to avoid prejudice to the Government from Jefferson's new arguments, the Court ordered supplemental submissions as follows:

- Jefferson must first submit a supplemental brief of no more than 2,100 words (1) providing (without any accompanying argument) any documents not currently in the record that he relied on in his briefing to show bad faith; and (2) identifying with greater specificity what "remedial measures" he requests in the event the Court denies his motion to dismiss;

- The Government must then submit a supplemental brief of no more than 4,200 words (1) addressing Jefferson's new arguments from his reply brief (a) regarding Officer Galt's report; and (b) that law enforcement "successfully hid from the government that Doe brandished a knife that night by sanitizing their reports and affidavits in a search warrant and complaint," Dkt. No. 67 at 2, and (2) responding to Jefferson's supplemental briefing regarding remedial measures. The Government should also provide (without any accompanying argument) any documents not currently in the record that the Government relied on in its briefing to rebut bad faith;

- Jefferson may then respond in no more than 2,100 words to the Government's brief on the issues of (1) Officer Galt's report, and (2) remedial measures.

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND DEFERRING IN PART THE MOTIONS TO SEAL - 2

Dkt. No. 70 at 13.

On September 13, 2024, Jefferson filed his initial supplemental brief along with 24 exhibits that he contended were relied upon in his motion to dismiss and/or reply. Dkt. Nos. 75, 77–79.[2] The Government filed its supplemental briefing on September 18, 2024, and Jefferson filed his reply on September 20, 2024. Dkt. Nos. 82, 86.

## II.   DISCUSSION

The Court concludes that Jefferson's failures to comply with Local Criminal Rule 12 is an admission that his motion is without merit. LCrR 12(b)(4). Even if the Court were to consider the merits of the deferred portions of Jefferson's motion, though, *see* Dkt. No. 70 at 11–13, Jefferson has not met his burden of showing law enforcement bias sufficient to constitute a due process violation, nor has he shown a sufficient basis for a lesser remedial measure, including an adverse inference jury instruction.

**A.   Jefferson's Violations of the Local Rules and Court Orders Justifies Summary Denial**

Under Local Criminal Rule 12(b)(4), "[i]f a party fails to file the papers required by this rule, . . . such failure may be deemed by the court to be an admission that the motion . . . is without merit." Jefferson's numerous and repeated violations of Local Criminal Rule 12 and this Court's orders in connection with his motion to dismiss and supplemental briefing are sufficiently serious to justify a summary denial of the motion.

As described above, both parties violated Rule 12(b)(1) and (2) by relying on evidence that was not in the record in their briefing on the motion to dismiss without providing accompanying declarations or exhibits. Dkt. No. 70 at 4; LCrR 12(b)(1)–(3) (if a brief "requires the consideration of facts not appearing of record, the [filer] shall also serve and file copies of all affidavits and

---

[2] This submission violated the Court's order and applicable rules, as discussed below.

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND DEFERRING IN PART THE MOTIONS TO SEAL - 3

photographic or documentary evidence presented in support of the motion"). The Court provided another chance for the parties to submit into the record the materials upon which each party relied in the initial briefing, and for Jefferson to "identify[] with greater specificity what 'remedial measures' he requests" in the event the motion to dismiss was denied. Dkt. No. 70 at 4, 13.

Despite submitting only 13 pages of briefing in connection with the motion to dismiss, Dkt. Nos. 56, 67, Jefferson submitted 24 exhibits spanning over 600 pages in his supplemental exhibit submission, Dkt. Nos. 78, 78-1, 78-2, 79; *see also* Dkt. No. 75 at 2–4. Rule 12(e)(8) requires that "[a]ll exhibits submitted in support of or opposition to a motion must be clearly marked with divider pages." *See also* Fed. R. Evid. 901. Jefferson violated this rule: he consolidated 19 of his exhibits into a single "Exhibit 1" without cover sheets or stamps delineating those separate exhibits. Dkt. No. 79. Rule 12(e)(8) also requires that

> [a]ll exhibits must be marked to designate testimony or evidence referred to in the parties' filings. Acceptable forms of markings include highlighting, bracketing, underlining or similar methods of designations but must be clear and maintain the legibility of the text. Filing parties shall submit only those excerpts of the referenced exhibits that are directly germane to the matter under consideration, or necessary to provide relevant context. Excerpted material must be clearly and prominently identified as such.

Jefferson did none of this. He did not mark the portions of the exhibits he relied on, nor did he make any effort to indicate where in his briefing he relied on a particular exhibit. Dkt. No. 75 at 2–4. This is unacceptable. "Judges are not like pigs, hunting for truffles buried in the record," *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (cleaned up); litigants, rather than courts, "must ferret out and articulate the record evidence considered material to each legal theory advanced," *Rocky Mountain Wild, Inc. v. United States Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022) (cleaned up).

These did not mark the end of Jefferson's violations. Despite the fact that Jefferson submitted his reply brief on the motion to dismiss on September 3, 2024, Dkt. No. 67, his

supplemental exhibit submission included documents that he did not receive until after that date, Dkt. No. 75 at 4. It was therefore apparent that Jefferson had violated the Court's order by submitting documents he had not relied upon in his briefing. The Court accordingly issued the following minute order:

> The Court is in receipt of Mr. Jefferson's [Dkt. No.] 75 supplemental briefing listing 24 exhibits "to supplement the Motion to Dismiss." Dkt. No. 75 at 2-4. The Court's order permitted Jefferson to provide only those "documents not currently in the record that he relied on in his briefing." Dkt. No. 70 at 13. The Court accordingly ORDERS Jefferson's counsel to submit by no later than September 18, 2024, a declaration compliant with 28 U.S.C. § 1746 identifying, for each of the 24 exhibits submitted, the specific page number(s) and line number(s) in his motion or reply brief, Dkt. Nos. 56, 67, where Jefferson relied on the exhibit. The declaration must also identify any exhibit upon which Jefferson did not rely in his briefing. The Court further notes that Jefferson's submission of the 24 documents grouped into six "exhibits" violates Rule 12(e)(8), which requires that "[a]ll exhibits submitted in support of or opposition to a motion must be clearly marked with divider pages." See also Fed. R. Evid. 901. Jefferson's submission also violates Rule 12(e)(8) because it fails to mark the exhibits "to designate testimony or evidence referred to in [his] filings." Because Jefferson has already been given an opportunity to rectify his failure to submit exhibits in compliance with Rule 12, Jefferson will not be permitted to correct these additional failures, and the Court reserves its right to determine that his motion is without merit under Rule 12(b)(4).

Dkt. No. 80. The Court cautioned that "any misrepresentations to the Court or further violations of the Local Criminal Rules may result in sanctions." *Id.* In response to the Court's order, one of Jefferson's attorneys attested under penalty of perjury that:

- In Jefferson's August 19, 2024 motion to dismiss, Dkt. No. 56, he relied on numerous documents that the Government first produced to him after August 19, 2024. Dkt. No. 81 at 3–6 (citing (1) Ex. 1 at 1–5 (exhibit 1), produced on August 26, 2024; (2) Ex. 1 at 30–38 (exhibit 4), produced on August 30, 2024; (3) Ex. 1 at 38–40 (exhibit 5), produced on August 30, 2024; (4) Ex. 1 at 41–43 (exhibit 6), produced on August 30, 2024; (5) Ex. 1 at 96–120 (exhibit 8), produced on August 23, 2024; (6) Ex. 1 at 302 (exhibit 17), produced on August 23, 2024; (7) Ex. 4 at 1–110 (exhibit 22), produced

on September 12, 2024; (8) Ex. 5 (exhibit 23), produced on September 12, 2024; (9) Ex. 6 at 1–164 (exhibit 24), produced on September 13, 2024).

- In Jefferson's September 3, 2024 reply brief, Dkt. No. 67, he relied on numerous documents that the Government first produced to him after September 3, 2024. Dkt. No. 81 at 6 (citing (1) Ex. 4 at 1–110 (exhibit 22), produced on September 12, 2024; (2) Ex. 5 (exhibit 23), produced on September 12, 2024; (3) Ex. 6 at 1–164 (exhibit 24), produced on September 13, 2024).

For exhibits 22 through 24, Jefferson's attorney stated in a footnote that although the documents were received after the relevant filings, his "review of the discovery already received, [his] experience as a criminal defense lawyer, and common sense provided a basis to rely on this document." Dkt. No. 81 at 6 n.5–7. No explanation was provided for exhibits 1, 4, 5, 6, 8, or 17. Counsel's declaration defies logic, the Court's order, and other applicable law.

A basic and well-established rule is that parties are not permitted to introduce new arguments or evidence without providing the opposing party an opportunity to respond. *United States v. Sanders*, 992 F.3d 583, 586 (7th Cir. 2021) ("Due process requires that a party be given an opportunity to respond to an argument or evidence raised as a basis to dismiss his or her claims." (cleaned up)); *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1171–72 (9th Cir. 2018) ("Plainly, the practice rules recognize the potential inequities that might flow from the injection of new matter" without providing the opposing party an opportunity to respond). The appropriate way to introduce such arguments or evidence is through a motion for leave, not through unilaterally presenting new materials to the Court that are outside the scope of its supplemental briefing order and misrepresenting to the Court that such materials are properly before it. *See United States v. Corral-Calderon*, No. CR2100228001PHXGMS, 2021 WL 6197906, at *1 n.1 (D. Ariz. Dec. 29, 2021) (holding that court could not consider facts and arguments in defendant's "new filing

1   amount[ing] to a sur-sur-reply filed without leave of Court"); *United States v. Abrams*, No.

2   314CR00069MMDWGC, 2020 WL 1866263, at *3 (D. Nev. Apr. 13, 2020) (striking defendant's

3   improper attempt to supplement his motion without leave of court); *cf. United States v. Williams*,

4   693 F.3d 1067, 1072 n.2 (9th Cir. 2012) (party waived argument by raising it after the close of

5   briefing at oral argument, depriving the opposing party of "a fair opportunity to respond

6   comprehensively to [the] claim" and the court "of the benefit of a robust debate informed by

7   zealous advocacy" (quoting *Outdoor Media Grp., Inc. v. City of Beaumont,* 506 F.3d 895, 900 (9th

8   Cir. 2007)).

9       Because (1) it is demonstrably untrue that Jefferson relied on exhibits 1, 4, 5, 6, 8, 17, 22,

10  23, and 24 in briefing submitted before those documents were received, (2) the falsities in

11  counsel's declaration undermine its reliability, (3) Jefferson failed to mark exhibits to designate

12  testimony or evidence referred to in his filings, and (4) Jefferson did not seek leave or another

13  appropriate mechanism to present these materials to the Court,[3] the Court STRIKES these exhibits

14  and associated arguments from the record. Jefferson's multiple failures to comply with Local

15  Criminal Rule 12 and this Court's orders are deemed by the Court to be an admission that his

16  motion does not have merit. LCrR 12(b)(4).

17      The Court has no doubt that counsel believed they were zealously representing their client

18  in taking the liberties described above. Instead, though, they breached the Court's trust and

19  repeatedly disregarded their duties under Local Criminal Rule 62.3(a). This conduct falls below

20

21  [3] Jefferson repeated this error in his supplemental reply. The Court permitted him only to respond to the Government's supplemental brief on "(1) Officer Galt's report, and (2) remedial measures." Dkt. No. 70 at 13. Instead, Jefferson

22  advanced new arguments regarding body camera footage he allegedly received after the Government filed its supplemental brief. Dkt. No. 86 at 2–4. Notably, Jefferson's counsel did nothing to support their factual assertion regarding when they received the footage, and did not file a declaration authenticating the attached exhibits. *Id.* at 2;

23  Dkt. No. 87. Based on a prior declaration from Jefferson's counsel, it appears that the relevant footage from Officer Granger was produced to the defense on July 21, 2023. Dkt. No. 81 at 6 ¶ 21; *see also* Dkt. No. 77 (Ex. 3); Dkt. No. 82 at 4. The Court STRIKES and does not consider Jefferson's new arguments regarding Officer Granger's body

24  camera footage. Dkt. No. 86 at 2–4.

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND
DEFERRING IN PART THE MOTIONS TO SEAL - 7

what is expected in this district. Although the Court warned that sanctions may result from misrepresentations to the Court, Dkt. No. 80, it declines to impose formal sanctions under Rule 62.3(c) at this time. It does require, however, that Jefferson's attorneys provide a copy of this Order to the Federal Defender and the First Assistant Federal Defender for the Western District of Washington in the hopes that the attorneys will engage in constructive discussion of counsel's obligations under Rule 62.3(a) and how counsel might avoid violating the Court's orders and the Local Criminal Rules in the future. The Court again cautions that it may impose sanctions or other discipline if more violations of this nature occur. *See* LCrR 62.3(c).

To be clear, the Court does not believe the failings described above amount to ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668 (1984). As discussed below, even if Jefferson's new arguments and exhibits were properly before the Court, his motion lacks merit.

**B.    Jefferson's Motion to Dismiss the Indictment on Due Process Grounds is Denied**

The Court denies the remaining portions of Jefferson's motion to dismiss, Dkt. No. 56, because he has not met his burden of showing that law enforcement's alleged investigatory missteps resulted from bad faith or animus against Jefferson.

Where, as here, the evidence at issue is not materially exculpatory but is still "potentially useful," a failure to preserve it "does not violate due process '*unless a criminal defendant can show bad faith*'" on the part of the government. *Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004) (emphasis added) (quoting *Arizona v. Youngblood,* 488 U.S. 51, 58 (1988)). To determine whether bad faith exists, the Court considers several non-dispositive factors: whether law enforcement was alerted to the value of the evidence, *United States v. Zaragoza-Moreira*, 780 F.3d 971, 979 (9th Cir. 2015) (finding bad faith where officer was "repeatedly alerted . . . to . . . the potential usefulness" of the video), the officer's knowledge that the evidence would be destroyed and the

credibility of the officer's explanation for not collecting the evidence, *see Miller v. Vasquez*, 868 F.2d 1116, 1121 (9th Cir. 1989), evidence of malice or prejudice towards the defendant, *see id.*, and whether the government acted with deliberateness, *see United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (finding no bad faith where evidence was mishandled rather than intentionally corrupted). Officers collecting evidence "in accord with their normal practice" are presumptively acting in good faith. *See California v. Trombetta*, 467 U.S. 479, 488–89 (1984).

Here, nothing in the record shows any overt law enforcement malice toward Jefferson, distinguishing this case from *Miller v. Vasquez*, 868 F.2d 1116 (9th Cir. 1989) and similar cases. *See id.* at 1121 (possible bad faith where officer referred to the defendant using an expletive and tried to dissuade witnesses from testifying in favor of the defendant).[4] No other relevant considerations compel a finding of bad faith either.

1.  Jefferson has failed to show that law enforcement was contemporaneously aware of the evidence's possible exculpatory value

The record undermines Jefferson's argument that law enforcement were aware the evidence might have had some exculpatory value when they decided not to preserve it. *See Youngblood*, 488 U.S. at 57 ("The presence or absence of bad faith . . . turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.").

To start, the value of each piece of potential evidence is speculative: as explained in the Court's prior order, if tested or analyzed, the evidence could have had some potential exculpatory value, but it also could have been neutral or incriminatory. *See* Dkt. No. 70 at 7–8. The existence

---

[4] As the Court previously found,

> [Jefferson's] suggestion that Officer Granger's "incorrect[] identifi[cation of] petechial hemorrhaging in both of Doe's eyes" indicates animosity or bias, Dkt. No. 67 at 3–4, falls flat because the forensic nurse—who Jefferson does not allege harbored any bias—made the same identification, Dkt. No. 1 at 3.

Dkt. No. 70 at 11; *see also* Dkt. No. 79 at 13, 36–37, 110.

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND DEFERRING IN PART THE MOTIONS TO SEAL - 9

of law enforcement bias is doubtful where, as here, the potential evidence may have favored the prosecution following testing. *See Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (in Section 1983 action stemming from sexual abuse investigation, rejecting argument that investigating officer acted in bad faith by deciding not to collect physical evidence like bed sheets and clothing, where the value of that untested evidence was speculative and may have incriminated the defendant further); *United States v. Hinkson*, No. CR-04-127-S-RCT, 2004 WL 7333646, *13–14 (D. Idaho Dec. 22, 2004) (no bad faith where officer turned off tape recorder during pat down, in part because recording of conversation could have been incriminating).

Jefferson argues that officer bias is still evident from the fact that law enforcement failed to collect the knife even after Doe "confessed" to Officer Granger that she "pulled a knife" on Jefferson. Dkt. No. 67 at 4. But the evidence (submitted by Jefferson only after the Court requested it) does not support these representations. Doe did not confess to pulling a knife on Jefferson. Nor is the knife a central or even notable part of her recollection of the incident that she shared with Officer Granger. In the 58-page transcript, Doe only mentions the knife twice, recounting that she briefly grabbed it as Jefferson charged toward her, then put it down before Jefferson punched her in the face. Dkt. No. 84 at 19 ("[T]hat's when he came out and he came towards me. I grabbed a bread knife and then he came running at me. So I set the knife down and that was when he punched me here, right in the jaw."); Dkt. No. 77 (Ex. 3).[5] Jefferson has not shown that Officer Granger's interview with Doe put law enforcement on notice that the knife was a potentially useful piece of evidence for Jefferson. Nothing about Doe's statements suggests that the knife touched Jefferson, or that there was any blood on it. *See generally* Dkt. No. 84 at 13–70. Indeed, Doe informed Officer Granger that she tried to scratch Jefferson while he was strangling her and "got his ear," *id.* at 21,

---

[5] The video excerpt submitted by the defense to the Court omitted the part of Jane Doe's statement where she stated that she set the knife down before Jefferson punched her. Dkt. No. 77 (Ex. 3).

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND DEFERRING IN PART THE MOTIONS TO SEAL - 10

and Granger confirmed when he arrested Jefferson that the scratch below his ear "appeared to have come from a fingernail or similar," Dkt. No. 79 at 13.

Jefferson's related argument that law enforcement demonstrated their bias by "obtain[ing] a warrant to search the home but ma[king] no effort to collect the knife" fares no better. Dkt. No. 67 at 6. The record reflects that the warrant was for Jefferson's arrest, not to search the home. Dkt. No. 82 at 11; *see also* Dkt. No. 79 at 20 (warrant issued by a tribal court judge for Jefferson's arrest); Dkt. No. 79 at 23 (Officer Granger's sworn declaration, seeking a warrant "to enter [Jefferson's home] . . . to obtain [him]."). Because the arrest warrant did not authorize law enforcement to search Jefferson's home, it is unsurprising that officers did not collect evidence (including the knife) from the home. For the same reason, Jefferson's accusation that Officer Granger intentionally "sanitiz[ed]" his sworn declaration for the arrest warrant by omitting any reference to the knife is a red herring at best, and a misrepresentation at worst. *See* Dkt. No. 67 at 2, 4.[6] Nor does the tribal court complaint and probable cause statement's omission of the knife suggest any kind of foul play. Dkt. No. 79 at 262–69 (tribal court complaint); *Id.*at 270–71 (probable cause statement).

This creates a domino effect for how law enforcement might have reasonably viewed the other pieces of potential evidence at the time. For example, law enforcement had no reason to suspect the knife touched Jefferson, and reasonably believed the injury on Jefferson's neck was a

---

[6] An argument advanced by Jefferson in his supplemental reply highlights additional deficiencies in Jefferson's briefing. Again, Jefferson argued in his motion to dismiss briefing that "[l]aw enforcement obtained a warrant to search the home but made no effort to collect the knife[.]" Dkt. No. 67 at 6. Despite having obtained the warrant in discovery in July 2023, Dkt. No. 81 at 3, Jefferson did not provide it as an exhibit so that the Court could test the veracity of Jefferson's factual assertion. Now that the warrant is in the record, making it clear that it was not to search the home but to arrest Jefferson, Dkt. No. 79 at 20–23, Jefferson revises his argument to complain that "Granger and his fellow officers never <u>tried</u> to apply for a search warrant for the house," Dkt. No. 86 at 5. Not only does this directly contradict Jefferson's prior representation to the Court that "law enforcement obtained a warrant to search the home," it advances an argument for the first time in a supplemental reply to which the Government has not had an opportunity to respond. That said, Jefferson has not established that law enforcement knew of the possibility of any exculpatory evidence in the home, nor has he established that it is a normal law enforcement practice to obtain a warrant to search the home in circumstances such as these.

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND DEFERRING IN PART THE MOTIONS TO SEAL - 11

result of Doe scratching him with her fingernails,[7] so it is reasonable to infer that law enforcement did not view the knife or Jefferson's injury as having any value to Jefferson. The Court agrees with the Government that Jefferson has not shown the officers had knowledge of the exculpatory value of the knife or of a photo of the scratch on his neck at the time of his arrest. Dkt. No. 82 at 4–5 (citing *Youngblood*, 488 U.S. at 57). Additionally, at least one other court has doubted that law enforcement's failure to "take all of the photographs that a defendant would prefer to have access to" could violate due process. *See Hendrix*, 2019 WL 6683509, at *2 n.2.

Turning to Officer Galt's report of blood on Doe's hand, Dkt. No. 79 at 5, the Court similarly finds that based on the facts at the time, there is no basis to assume that law enforcement knew that preserving the blood for testing would be potentially useful evidence for Jefferson. Even if they had tested the blood and it had been Jefferson's, the presence of blood between Doe's fingers is consistent with her scratching his neck with her fingernails during the incident, Dkt. No. 84 at 21, or touching her bloody knee, Dkt. No. 79 at 5. Whether Officer Galt's report was produced to the defense on April 10, 2023 or significantly later does not alter the availability of the blood evidence. And the report itself is not lost or destroyed for purposes of *Youngblood* because it was ultimately produced to the defense, who has not been precluded from advancing arguments about it.

2.  <u>Jefferson has not shown that law enforcement deviated from normal practice</u>

When law enforcement collects evidence in accord with their normal practice, they are unlikely to be acting in bad faith. *Trombetta*, 467 U.S. at 488–89; *Mitchell v. Goldsmith*, 878 F.2d 319, 322 (9th Cir. 1989).

---

[7] Again, Doe said as much during her recorded interview with Officer Granger. *See* Dkt. No. 84 at 21 ("I was reaching for whatever I could reach on him. I know I got his ear. I might have got the back of his neck.").

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND DEFERRING IN PART THE MOTIONS TO SEAL - 12

Jefferson's argument that law enforcement did not follow their training and relevant policies lacks merit. As a threshold matter, the training materials are not properly before the Court, Dkt. No. 81 at 6 (the training materials were produced after the date of Jefferson's reply brief); Jefferson raises arguments regarding these materials for the first time in his supplemental reply, Dkt. No. 88-1 at 5, again depriving the Government of an opportunity to respond.

Even if the materials were permissibly before the Court, Jefferson does not indicate which practices described in the materials are standard practices as opposed to best practices. For example, Jefferson represents that a training course Officer Granger attended "discussed the importance of the crime scene and getting crime scene investigators involved," Dkt. No. 88-1 at 5, but the training indicates that this is a best practice, as opposed to a standard practice. The slide in question states, "If you treat every strangulation crime scene as a homicide, you will likely prevent one." Dkt. No. 78 at 64. While CSI involvement may be standard for homicides, this slide suggests that it is not for strangulations. *Id.* "[F]ailure to use best practices in preserving evidence is not sufficient, by itself, to establish bad faith." *United States v. Gutierrez*, 415 F. App'x 870, 875 (10th Cir. 2011).

It is also not apparent that certain of the training materials apply to Doe's case at all. Jefferson argues that the attendees at the training "discussed the critical value of documenting and photographing both defensive and offensive injuries," and Granger did not employ this training. Dkt. No. 88-1 at 5. The pages of the training Jefferson cites, however, refer to why officers perform a suspect examination "in sexual assault cases," where DNA evidence from "hands, body, genitals" is "vital." Dkt. No. 78 at 50–51. While the materials also instruct officers to "[a]nticipate the suspect will likely have more injuries than the victim" and "[i]dentification of [the] dominant aggressor is going to be key," *id.* at 57, here Jane Doe had informed Officer Granger that Jefferson had punched her and then pushed her face-down on the ground and "was sitting on [her] butt . . .

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND DEFERRING IN PART THE MOTIONS TO SEAL - 13

1    pulling [her] neck back" as he strangled her, making it difficult for her to reach him, Dkt. No. 84

2    at 21 ("I was reaching for whatever I could reach on him. I know I got his ear. I might have got

3    the back of his neck."). Law enforcement's failure to catalogue what they reasonably believed to

4    be minimal injuries to Jefferson does not reflect bad faith.

5         Finally, Jefferson's argument regarding law enforcement's purported failure to swab

6    underneath Doe's fingernails is unpersuasive. The training materials from the strangulation

7    prevention training appear only to suggest swabbing for a victim's hands and neck for DNA in the

8    event the defendant denies touching the victim, rather than in the event the defendant claims self-

9    defense. Dkt. No. 78 at 66. And again, it is not clear whether these materials describe a standard

10   practice as opposed to a best practice. Moreover, as the Court previously noted, the forensic team

11   at the hospital who examined Doe likewise did not swab her fingernails for DNA, which further

12   undercuts the notion that law enforcement's purported "failure" to do so was out of the ordinary.

13   *See* Dkt. No. 62 at 7 n.3; Dkt. No. 70 at 11.

14                                    * * *

15        Under these circumstances, the Court cannot find that law enforcement acted in bad faith.

16   To do so would depart from Ninth Circuit precedent requiring conduct to be far more egregious

17   than that involved here to find bad faith. For example, in *United States v. Cooper*, 983 F.2d 928

18   (9th Cir. 1993), the government destroyed equipment that it claimed was used by the defendants

19   to manufacture methamphetamine, *id.* at 930. Defendants argued they were lawfully

20   manufacturing a fuel additive, and the government's destruction of the entire lab deprived them of

21   the ability to establish their defense. *Id.* at 929–30. The government offered no excuse for its

22   decision, and the destruction took place at a time when government investigators knew the nature

23   of the defense and after defendants had made several requests for return of the equipment. *Id.* at

24   931. Similarly, in *United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015), the defendant

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND
DEFERRING IN PART THE MOTIONS TO SEAL - 14

1   was arrested by border patrol officers after a pat down search led to the discovery of drugs on her

2   person, *id.* at 974–75. During the interview following her arrest, the defendant asserted that she

3   was coerced into carrying the drugs, and that while standing in the pedestrian line she tried to draw

4   the attention of law enforcement by making noise and moving around. *Id.* at 975–76. Despite

5   defendant's claim of duress, and her insistence that her actions while standing in line supported

6   her claim, the agent who interviewed the defendant did not preserve video of the pedestrian line.

7   *Id.* at 976–77.

8         By contrast, in *United States v. Robertson*, 895 F.3d 1206, 1211 (9th Cir. 2018), a postal

9   employee was convicted of stealing mail, and later argued that the government had improperly

10  allowed potentially exculpatory security camera footage of the employee parking lot at her

11  workplace to be deleted because of the Postal Inspection Service's thirty-day retention period for

12  such footage, *id.* at 1211. The government case agent had been aware of the possible existence of

13  the parking lot video, but the evidence did not show that the video's exculpatory value was

14  apparent at the time. *Id.* The Ninth Circuit affirmed the district court's decision not to dismiss the

15  case or impose other sanctions, noting that it was "completely speculative whether the parking lot

16  video was potentially useful" to the defense. *Id.* at 1211-12.

17        The facts here are much closer to *Robertson* than *Zaragoza-Moreira* or *Cooper*. As in

18  *Robertson*, the law enforcement officers failed to collect evidence "of speculative value" but did

19  not engage in "a conscious effort to suppress exculpatory evidence" supporting a finding of bad

20  faith. *Id.* at 1212. At most, all Jefferson has shown is that law enforcement's investigation was

21  negligent or incomplete. *See* Dkt. No. 88-1 at 5. But as the Government points out, that does

22  suffice. *See* Dkt. No. 82 at 9–10 (citing *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir.

23  2013); *Cunningham*, 345 F.3d at 812; *Grisby v. Blodgett*, 130 F.3d 365, 372 (9th Cir. 1997)).

24        Jefferson's motion to dismiss the indictment on due process grounds is therefore denied.

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND
DEFERRING IN PART THE MOTIONS TO SEAL - 15

**C.     Jefferson's Motion for Remedial Measures is Denied**

Jefferson asks the Court to provide the following adverse inference instruction to the jury:

> You have heard testimony that Lummi Nation Police Department failed to collect or preserve certain evidence including a knife at the scene, pictures of any injuries on Mr. Jefferson's neck, and pictures of any hand injury of the alleged victim. If you find that the Government intentionally failed to preserve these items, and that the Government knew or should have known the items would be evidence in this case, you may infer, but are not required to infer, that the evidence is unfavorable to the Government.

Dkt. No. 75 at 5.

In situations not implicating constitutional due process, "an instruction concerning evidence lost or destroyed by the government is appropriate when the balance between 'the quality of the Government's conduct and the degree of prejudice to the accused' weighs in favor of the defendant." *Robertson*, 895 F.3d at 1213 (quoting *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (Kennedy, J., concurring)). The Government bears the burden of justifying its actions, and the defendant bears the burden of proving prejudice. *Id.* In evaluating the quality of the Government's conduct, the Court considers whether the evidence was lost or destroyed while in government custody, whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, whether any deliberate acts were taken in good faith or with reasonable justification, and whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence. *United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013).

Here, evidentiary sanctions are not warranted. The Court finds that the Government and Lummi law enforcement's actions were "within a general range of reasonableness." *Robertson*, 895 F.3d at 1213 (applying *Loud Hawk*). Law enforcement interviewed Jane Doe, took numerous photos of her, recorded and retained body camera footage of interactions with Doe and Jefferson,

had Doe seen by medical staff, and authored and retained thorough reports. Dkt. No. 79 at 1–8, 30–95; Dkt. No. 77; Dkt. No. 84 at 22. Given Jane Doe's statements regarding her non-use of the knife and Jefferson's minimal injuries (which appeared to Officer Granger to be a fingernail scratch, Dkt. No. 79 at 36, consistent with Jane Doe's statements that she scratched him, *id.* at 34; Dkt. No. 84 at 21), it is not apparent that law enforcement acted in disregard for the interests of the accused in failing to photograph Jefferson's neck, seek a warrant to collect the knife, or collect and test the blood on Jane Doe's hand. Law enforcement did photograph Jane Doe's hands, Dkt. No. 68 at 2, but the blood that Officer Galt observed, Dkt. No. 79 at 5, was not visible in those pictures—potentially due to the angle. To the extent best practice would have been for law enforcement to photograph the scratch on Jefferson's neck and the blood on Jane Doe's fingers, to test the blood on Jane Doe's hand, or to attempt to recover the bread knife, the failure to do so is not attributable to the FBI agents or the government attorneys prosecuting the case, who did not participate in the initial investigation. *See* Dkt. No. 79 at 282–84 (suggesting that the federal government investigated the case beginning in May 2023). Therefore, with the exception of the late production of Officer Galt's report, the Government has carried its burden of justifying its actions.

As to the late production of Galt's report, the Government has shown that it timely requested "all case reports" for the investigation of Jefferson in April 2023, and the Lummi Nation Police Department Support Services Specialist responded, "Here you go" without indicating that Officer Granger's and Officer Galt's reports had not yet been approved for disclosure. Dkt. No. 84 at 74–75 (records delivered on April 10, 2023 at 10:58 a.m.); Dkt. No. 82-6 at 2 (Galt's report was approved on April 10, 2023 at 10:57 p.m., and Granger's report was approved at 11:12 p.m.). However, the Court agrees with Jefferson that "[t]hat does not explain why the government failed to receive [the Galt report] for nearly a year and a half," especially considering that the

Government received and produced Officer Granger's report sooner. Dkt. No. 86 at 3; *see also* Dkt. No. 56 at 2 (demonstrating that the defense had Officer Granger's report by the time it filed its motion to dismiss on August 19, 2024). Nevertheless, Jefferson fails to explain how he is prejudiced by the late production of Officer Galt's report. Indeed, the report has not been lost or destroyed, and Jefferson has been permitted to advance arguments regarding the contents of the report and its late production in connection with his motion to dismiss.[8]

Jefferson primarily relies on *Hendrix*, 2019 WL 6683509 in support of his request for a lost evidence jury instruction. Dkt. No. 88-1 at 6–7. There, the defendant was charged with possession of narcotics and firearms after law enforcement discovered the contraband inside a fanny pack and plastic baggies, and law enforcement failed to preserve the fanny pack and plastic baggies. *Hendrix*, 2019 WL 6683509, at *1–2. Despite concluding that there was no evidence that law enforcement acted in disregard of the defendant's interests, making the government's conduct "well short of egregious," the court granted the request for a lost or destroyed evidence jury instruction because the missing items were relevant to the charges (though not crucial or exculpatory) and the conduct was "somewhat troubl[ing]." *Id.* at 5–6.

The loss of evidence in *Hendrix* was much more deliberate and direct than in this case. The evidence had been inventoried and was in local law enforcement's possession for several months before being later destroyed, with the federal authorities standing idly by. *Id.* at *6 (noting that the government had "more than five months to collect and preserve this evidence," and although an agent collected some evidence, he chose not to collect the evidence at issue). Here, the evidence was not lost because of government mishandling. Instead, Jefferson faults law enforcement for not collecting certain pieces of evidence he believes could be useful to his defense. Courts routinely

---

[8] The Court notes that it would have requested supplemental briefing and continued trial irrespective of whether the Galt report was timely, for the reasons discussed in its prior orders. Dkt. No. 74 at 2–5.

deny motions for remedial measures in cases such as these, where the government failed to collect evidence of speculative value and had no direct role in its destruction. One such example is in *Robertson*, where the Ninth Circuit affirmed the district court's decision not to instruct the jury on lost or destroyed evidence as a sanction for the government's failure to preserve a parking lot video with speculative exculpatory value. 895 F.3d at 1211–14. Although the government's conduct was "not entirely blameless," it still "fell within a general range of reasonableness," given that "the exculpatory value of the evidence was not apparent," the government was unaware of the custodian's 30-day automatic deletion process, and "neither the OIG agents nor the government attorneys prosecuting the case participated in the events leading to the loss of the evidence." *Id.* at 1211, 1213–14; *see also*, *e.g.*, *United States v. Gibson*, No. CR-11-00734-WHA, 2012 WL 1123057 (N.D. Cal. Apr. 3, 2012) (felon-in-possession defendant was not entitled to sanctions where investigating officer failed to take into evidence the laundry bag containing the charged firearm); *United States v. Brown*, No. 2:17-CR-58 JCM (VCF), 2018 WL 451556, at *4 (D. Nev. Jan. 16, 2018) (no sanctions where officers negligently "failed to collect evidence" by turning off their body cameras during portions of their investigation).

Finally, it is Jefferson's burden to show prejudice, and he has failed to meet that burden. Conclusory statements that the missing evidence "is relevant and critical to self-defense" do not suffice. Dkt. No. 88-1 at 7. Jefferson's initial brief regarding remedial measures does not mention the word "prejudice" other than when quoting the government, and the reply brief does not mention the word at all. *See generally* Dkt. Nos. 75, 88-1. As the Court has previously observed, Jane Doe (and Jefferson, should he choose to do so) could testify as to the knife's role in the incident, the source of the scratch on Jefferson's neck, and the cause and extent of Doe's injuries. Dkt. No. 70 at 8. Officer Galt can also testify regarding the injuries he observed. Jefferson has not shown that such testimony is insufficient.

1      The Court therefore denies Jefferson's request for remedial measures.

2    **D.    Jefferson's Request for an Evidentiary Hearing is Denied**

3      Generally, evidentiary hearings must be held "only when the moving papers allege facts

4  with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that

5  contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). For the

6  reasons discussed above, the undisputed facts here show that Jefferson cannot establish that law

7  enforcement failed to obtain or preserve material evidence in bad faith, so an evidentiary hearing

8  on the issue of bad faith is unnecessary to resolve his motion.

9    **E.    The Motions to Seal are Granted in Part and Deferred in Part**

10      1.  <u>Legal standard</u>

11      Courts recognize a "general right to inspect and copy public records and documents,

12  including judicial records and documents." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172,

13  1178 (9th Cir. 2006) (internal quotation marks omitted) (quoting *Nixon v. Warner Commc'ns, Inc*.,

14  435 U.S. 589, 597 (1978)). When a district court considers a sealing request, it starts with "a strong

15  presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins*. Co., 331 F.3d

16  1122, 1135 (9th Cir. 2003). A party seeking to seal court filings bears the burden of overcoming

17  this presumption by providing "sufficiently compelling reasons for doing so." *Id*.

18      Because these motions to seal are in connection with a dispositive motion—Jefferson's

19  motion to dismiss the indictment—the Court uses the "compelling reasons" test. *Ctr. for Auto*

20  *Safety v. Chrysler Grp*., LLC, 809 F.3d 1092, 1095 (9th Cir. 2016).

21      2.  <u>Jefferson's motions to seal</u>

22      Jefferson first moves to seal all exhibits filed in support of his supplemental briefing.  Dkt.

23  No. 76 at 1. He provides the same rationale for all 24 exhibits, even though some are in the public

24  record. *See, e.g.*, Dkt. No. 79 at 280–85. The motion is only granted as to exhibits relating to Doe's

ORDER DENYING MOTION TO DISMISS OR FOR REMEDIAL MEASURES, GRANTING IN PART AND
DEFERRING IN PART THE MOTIONS TO SEAL - 20

injuries or medical records, as the Court finds sealing here is appropriate under this Court's protective order. Dkt. No. 21; *see also Karpenski v. Am. Gen. Life Cos., LLC*, No. 2:12-cv-01569-RSM, 2013 WL 5588312, at *1 (W.D. Wash. Oct. 9, 2013) (need to protect medical privacy qualifies as a "compelling reason" for sealing records). There are no less restrictive means of protecting Doe's privacy. For the remainder of the exhibits, the Court defers the request to seal and orders additional briefing from the Government. In its briefing, the Government should address whether it agrees these exhibits should be sealed, and if so, on what basis.

The Court thus orders the following with respect to Jefferson's first motion to seal:

| Ex. | Dkt. No. | Description | Court's Determination |
|---|---|---|---|
| 1-1 | 79 at 2–7 | Officer Daniel Galt's Report, dated April 8, 2023. | May remain under seal. |
| 1-2 | 79 at 8–9 | Officer Randy Cuellar's Report, dated April 8, 2023. | Deferred; Government to submit briefing. |
| 1-3 | 79 at 10–29 | Officer Thomas Granger's Criminal Citation, Probable Cause Statement, Witness Statement, Strangulation Questionnaire, Lethality Assessment Protocol, Search and Seizure Application for Search Warrant and Sworn Declaration, Return and Inventory, Evidence Seizure List, Search and Seizure Warrant, and Evidence Seizure List | Deferred; Government to submit briefing. |
| 1-4 | 79 at 31–38 | Officer Thomas Granger's Report | May remain under seal. |
| 1-5 | 79 at 39–41 | Officer Randy Cuellar's Report | Deferred; Government to submit briefing. |
| 1-6 | 79 at 42–44 | Officer Thomas Granger's Report | Deferred; Government to submit briefing. |
| 1-7 | 79 at 45–96 | Pictures of Jane Doe taken by Officer Granger on April 8, 2023. | May remain under seal. |
| 1-8 | 79 at 97–121 | Jane Doe's Medical Records prepared by Jeri C. Ammons RN, Jonathan Kreher MD, Sarah Anderson MD, and Lisa N. Anderson RN. | May remain under seal. |
| 1-9 | 79 at 122–41 | Jane Doe's Chart prepared by Lisa N. Anderson RN. | May remain under seal. |
| 1-10 | 79 at 142–259 | Pictures of Jane Doe taken by Lisa Anderson RN. | May remain under seal. |
| 1-11 | 79 at 260–61 | Federal Bureau of Investigation case opening report. | Deferred; Government to submit briefing. |
| 1-12 | 79 at 262–69 | Lummi Nation Tribal Court criminal complaint. | Deferred; Government to submit briefing. |
| 1-13 | 79 at 270–71 | Officer Granger's Lummi Nation Police probable cause statement. | May remain under seal. |

| 1-14 | 79 at 272–79 | Lummi Tribal Court Orders and Referrals to Remove No Contact Order. | Deferred; Government to submit briefing. |
| 1-15 | 79 at 280–87 | United States District Court for the Western District of Washington Complaint of Violation, Affidavit, and Arrest Warrant. | Deferred; Government to submit briefing. |
| 1-16 | 79 at 288–302 | Text Messages between Victim Witness Coordinator Tracy Orcutt and Jane Doe. | May remain under seal. |
| 1-17 | 79 at 303 | Memorandum, dated July 10, 2023, from Victim Witness Coordinator Tracy Orcutt to Assistant United States Attorney Tate London. | May remain under seal. |
| 1-18 | 79 at 304–08 | Signed Expert Witness Disclosure for Micheline Lubin MD. | Deferred; Government to submit briefing. |
| 1-19 | 79 at 309 | E-mail, dated August 15, 2024, from Micheline Lubin MD to AUSA Tate London. | Deferred; Government to submit briefing. |
| 2 | 77 | 4-second video clip of Jane Doe on April 8, 2023. | May remain under seal. |
| 3 | 77 | 9-second video clip of Jane Doe with Officer Granger on April 8, 2023. | May remain under seal. |
| 4 | 78 | Training Materials from 2-Day Virtual Strangulation Prevention Training attended by Officer Granger on April 4-5, 2023. | Deferred; Government to submit briefing. |
| 5 | 78-1 | Lummi Nation Police Department Policy Manual, Policies 310, 322, 403, 600, and 604. | Deferred; Government to submit briefing. |
| 6 | 78-2 | United States Indian Police Academy Office of Justice Services Training Academy Materials on Evidence Collection and Preservation, Fundamentals of Law Enforcement Photography, Indian Country Victim Services, and Communications and Interviewing. | Deferred; Government to submit briefing. |

Jefferson also moves to seal the exhibits filed in support of his reply brief. Dkt. No. 85; Dkt. Nos. 87, 87-1, and 87-2 (sealed exhibits). Jefferson asserts that "[t]his motion is based on the Discovery Protective Order (dkt. 21) and the protected material contained in the exhibits." Dkt. No. 85 at 1. It is not clear to the Court how the exhibits are subject to the protective order. The Court therefore defers ruling on this second motion to seal, and orders the Government to submit briefing on whether it agrees these exhibits should be sealed, and if so, on what basis.

3. The Government's motions to seal

Finally, the Government moved to seal the exhibits filed in support of its supplemental briefing. Dkt. No. 83; Dkt. No. 84 (sealed exhibits). The Government argues in conclusory fashion

that the exhibits "contain sensitive information concerning the victim and defendant." Dkt. No. 83 at 1.

The motion is granted in part and deferred in part. Exhibit 1 contains photographs of Doe's injuries and Exhibit 2 is the transcript of Doe's interview with Lummi law enforcement. Both may remain under seal to protect Doe's privacy. There are no less restrictive means of protecting Doe's privacy. Exhibit 3 is a photograph of Jefferson and Exhibit 4 comprises various emails and police records related to this case. Dkt. No. 84 at 72, 74–102. The motion as to these two exhibits is deferred; the Government is ordered to submit briefing that more specifically articulates a compelling reason for sealing these documents.

## III. CONCLUSION

For the reasons described above, the Court DENIES the remaining portions of Jefferson's motion to dismiss the indictment or for alternative remedial measures. Dkt. No. 56.

The Court also GRANTS IN PART AND DEFERS IN PART Jefferson's first motion to seal, Dkt. No. 76, and the Government's motion to seal, Dkt. No. 83, and DEFERS ruling on Jefferson's second motion to seal, Dkt. No. 85. The Government is directed to file briefing on the deferred portions of the motions to seal by October 21, 2024.

Defense counsel is ORDERED to provide a copy of this Order to the Federal Defender and the First Assistant Federal Defender for the Western District of Washington and file declarations confirming such delivery by no later than October 10, 2024.

Dated this 7th day of October, 2024.

Lauren King
United States District Judge