UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:23-cr-00109-LK |
| Plaintiff, | ORDER ON ADMISSIBILITY OF DEFENSE EXPERT RUSS HICKS' TESTIMONY |
| v. | |
| JOSEPH MICHAEL QUINCY JEFFERSON, | |
| Defendant. | |

This matter comes before the Court following the defense's submission of an expert report from Russ Hicks. The Court subsequently determined that a *Daubert* hearing was necessary, Dkt. No. 170 at 10 n.4; Dkt. No. 183 at 2; and the Government submitted a brief asking the Court to limit Hicks' testimony, Dkt. No. 225. For the reasons explained below, with the exception of a narrow range of testimony, Jefferson has not shown that it is more likely than not that the testimony of defense expert Russ Hicks meets the requirements of Rule 702 of the Federal Rules of Evidence.

ORDER ON ADMISSIBILITY OF DEFENSE EXPERT RUSS HICKS' TESTIMONY - 1

## I.    DISCUSSION

The Government plans to try Defendant Joseph Jefferson before a jury for one count of Assault by Strangulation in violation of 18 U.S.C. §§ 113(a)(8) and 1153(a). Dkt. No. 13. Trial is scheduled to begin on January 13, 2025. Dkt. No. 115. Jefferson intends to call Russ Hicks to testify that certain conduct of the tribal police officers in this case is "fundamentally incompatible" with state "police academy instruction and established Washington State law enforcement standards." Dkt. No. 161 at 3; Dkt. No. 161-2 at 31.

Jefferson initially asked the Court to consider Hicks' expert report in his most recent motion for reconsideration of the Court's order denying his motion to dismiss the indictment. Dkt. Nos. 161, 161-2, 161-3. In his motion, Jefferson stated that Hicks' opinion was also "critical for consideration" at trial. Dkt. No. 161 at 3. The Court declined to consider the untimely report in its determination of the motion to dismiss, Dkt. No. 170 at 8–10, and determined that a *Daubert* hearing was necessary to assess the reliability of Hicks' testimony prior to trial:

> The Court notes that Mr. Hicks' report does not indicate that he has experience with either federal or tribal law enforcement, Dkt. No. 161-2 at 2–4; Dkt. No. 161-3 at 1, and he bases most of his opinions on Washington State law and training on such law, which is inapplicable in this case, Dkt. No. 161-2 at 8, 12 & n.8, 14–25 & nn.14–22, 27, 29–30 & nn.31–32 (repeatedly citing the Revised Code of Washington and Washington State law enforcement training materials); *see also id*. at 31 (concluding that the Lummi Nation Police Department's conduct was incompatible with state police academy training and "established Washington State law enforcement standards"). Washington is an "optional" Public Law 280 state, and has extended state civil and criminal jurisdiction in Indian Country to only eight areas that do not apply here. Wash. Rev. Code § 37.12.010. And although many tribal police officers obtain cross-deputization to enforce state and/or federal law, necessitating training in such law, *see* Kevin Morrow, Bridging the Jurisdictional Void: Cross-Deputization Agreements in Indian Country, 94 N.D. L. Rev. 65, 68– 69 (2019), that does not render state law applicable to Indian-on-Indian crimes in Indian Country beyond the bounds of Congressional authorization, *see* 1 F. Cohen, Handbook of Federal Indian Law § 7.04 (2024). Of course, the fact that an officer completes training on another jurisdiction's laws and practices does not mean they apply in his jurisdiction.

Mr. Hicks also cites the 2024 Lummi Nation Police Manual without mentioning whether the provisions he cites were in effect in April 2023. Dkt. No. 161-2 at 11 n.7. Moreover, the few times he does cite Lummi Nation laws or policies, his analysis is conclusory or nonexistent. *See, e.g.*, Dkt. No. 161-2 at 15, 22–23.

Because the Court is required to make an explicit reliability finding to satisfy its gatekeeping duty prior to admitting expert testimony, *see United States v. Irons*, 31 F.4th 702, 716 (9th Cir. 2022); *United States v. Valencia-Lopez*, 971 F.3d 891 898-99 & n.6 (9th Cir. 2020), the parties should be prepared to address the reliability of Hicks' testimony at the pretrial conference—whether or not it is raised in an appropriate motion prior to that conference. In the absence of such a motion, the parties may submit briefing of no more than 2,800 words each on the admissibility of Mr. Hicks' testimony by December 30, 2024. This briefing is optional.

*Id.* at 10 n.4; Dkt. No. 183 at 2; *see also United States v. Holguin*, 51 F.4th 841, 853 (9th Cir. 2022) ("[E]ven if not required, it will often be beneficial for district courts to conduct some proceeding, focused on the reliability of expert testimony, such as a *Daubert* hearing or voir dire of proffered expert testimony.").

On December 27, 2024, Jefferson submitted a brief addressing the relevance and reliability of Hicks' testimony. Dkt. No. 182. Jefferson attached two supplemental reports drafted by Hicks following the Court's order. The first supplemental report attempts to provide a basis for "the reliability and methodology for his opinions," and the second contains "a comparison between Lummi policies and other law enforcement policies" in an effort to show that his opinions based on state law and state training are relevant to Lummi law enforcement's conduct in this case. Dkt. No. 182 at 2 n.1.

On January 9, the Government submitted a brief asking the Court to "permit [Hicks] to testify only as to limited points of training he has received that excluding those based on Washington State law, [to] the relevant policy governing the Lummi Nation Police Department, and [to] whether Officer Granger deviated from established Lummi Nation Police Department policy and protocol." Dkt. No. 225 at 5.

On January 10, 2025, the Court held a *Daubert* hearing on Hicks' proposed testimony. Dkt. No. 232.

## A.    Legal Standard

Under Rule 702, a trial court may exercise discretion to allow expert testimony if the proponent "demonstrates to the court that it is more likely than not that" such testimony (1) "will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "is based on sufficient facts or data;" (3) "is the product of reliable principles and methods;" and (4) "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d) (2023). "[B]efore admitting expert testimony, the district court must perform a 'gatekeeping role' to ensure that the testimony is both 'relevant' and 'reliable.'" *United States v. Valencia-Lopez*, 971 F.3d 891, 897–98 (9th Cir. 2020) (cleaned up). "This gatekeeping obligation 'applies to all (not just scientific) expert testimony.'" *Id.* at 898 (quoting *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002)).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook,* 598 F.3d 558, 565 (9th Cir. 2010). "Relevancy depends on the particular law at issue because '[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.'" *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196–97 (9th Cir. 2014) (quoting *Primiano,* 598 F.3d at 565). And whether testimony is helpful within the meaning of Rule 702 is also "in essence a relevance inquiry." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002).

The reliability inquiry must focus on the basis for the expert's opinion. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995). In other words, the inquiry "focuses not on 'what the experts say,' or their qualifications, 'but what basis they have for saying it.'" *Holguin*, 51 F.4th at 854 (quoting *Daubert*, 43 F.3d at 1316). Where, as here, the relevant reliability concerns

"focus upon personal knowledge or experience," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999), the inquiry may cover "whether the expert's experience supports the expert's conclusions," whether his "reasoning is circular, speculative, or otherwise flawed," or "whether the expert's reasoning is adequately explained." *Holguin*, 51 F.4th at 854. Although "*Daubert* and *Kumho Tire* may be harder to apply when the expert testimony is 'experience-based' rather than 'science-based,'" any such difficulty "cannot simply lead to a 'that goes to weight, not admissibility' default"; rather, there is "a strong argument that reliability becomes more, not less, important when the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony." *Valencia-Lopez*, 971 F.3d at 898; *see also* Fed. R. Evid. 702, Advisory Committee's Notes to 2023 amendments (decisions holding "that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. . . . are an incorrect application of Rules 702 and 104(a)").

Finally, the proponent of the expert testimony bears the burden of proving by a preponderance of the evidence that the testimony being proffered is admissible. *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

**B.   With Few Exceptions, Jefferson Has Not Shown by a Preponderance of the Evidence that Hicks' Testimony is Relevant and Reliable**

Jefferson contends that Hicks' testimony is "relevant to an inadequate or negligent police investigation," the "police culture that could lead to such inadequacies," and "to police bias." Dkt. No. 182 at 4. He argues that the testimony is also reliable, as demonstrated by Hicks' experience in local law enforcement and his years as an instructor at the Washington State Criminal Justice Training Commission. *Id.* at 7–8. Jefferson does not indicate that Hicks has any prior experience with either federal or tribal law enforcement, but analogizes his testimony to that of modus

operandi testimony concerning drug traffickers. *Id.* at 6. The Court addresses each of Hicks'
opinions in detail.

     1.  <u>Initial Report</u>

        *(a) Hicks' Background and Materials Reviewed*

At the beginning of the report, Hicks provides his background in state and local law enforcement and in state law enforcement training. Dkt. No. 161-2 at 2–3. He also provides a list of materials reviewed. *Id.* at 3, 32. These include numerous training materials from the Washington State Criminal Justice Training Commission. Hicks did not review the Lummi Constitution or Code of Laws, and reviewed only an overview and excerpts of United States Indian Police Academy materials. Rough Tr. 12–13, 55–56.

The parties do not dispute Hicks' knowledge of and experience in Washington state law and state law enforcement training. He has 14 years of state and local police patrol and supervision experience, including with assault and domestic violence cases. Dkt. No. 161-3 at 1; Dkt. No. 161-2 at 2–3; Dkt. No. 182-1 at 2. Hicks also served for 14 years "as a police academy instructor at the Washington State Criminal Justice Training Commission" where he "train[ed] new police officers in standardized procedures for conducting investigations, including those related to assault and domestic violence." Dkt. No. 182-1 at 5; *see also* Dkt. No. 161-3 at 1–3.

However, Hicks has almost no experience with tribal law enforcement or their practices, and has no prior experience with the Lummi Nation or its Police Department. Hicks' experience with tribal law enforcement is limited to his time in the Fife police department. There, he assisted the Puyallup police department with domestic violence and assault cases—including some enforcing tribal law—but that assistance was limited to stabilizing the scene and initial witness interviews at the scene. Rough Tr. 20–21. Hicks does not have any expertise in, or baseline knowledge of, what laws apply to tribes (or when they apply), or under what circumstances tribal

police can exercise state or tribal law. Rough Tr. at 50–51, 57; *compare id.* with 1 F. Cohen, Handbook of Federal Indian Law §§ 11.03–.04 (2024). Hicks' lack of knowledge and experience in this subject matter is highlighted by certain statements and opinions in his reports, which are discussed in detail below.

> *(b) Hicks' Methodology – Initial Report and First Supplemental Report*

In this section of the report, Hicks describes his general methodology and the standards by which he evaluates Officer Granger's (and more generally, Lummi law enforcement's) conduct. Hicks writes that his opinions are based on his evaluation of the "evidence in light of [his] own experience, education and training and legal guidelines, both case law and statutory, agency policies and law enforcement accepted industry standards." Dkt. No. 161-2 at 6.[1]

In the first supplemental report, Hicks augments his "methodology" discussion, providing separate methodologies for his opinions (1) "based on patrol experience and supervision," (2) "based on [his] academy instruction experience," and (3) based on "police culture." Dkt. No. 182-1 at 2, 5, 8 (capitalization removed). Hicks explains that his opinions reflect "general principles and methodologies that [he] ha[s] learned . . . that are applicable to any assault or domestic violence investigation." *Id.* at 2; *see also* Dkt. No. 182-2 at 2 (Hicks' testimony will address "standardized law enforcement procedures in assault and domestic violence investigations"). Hicks avers that his experience as a police academy instructor at the Washington State Criminal Justice Training Commission provided him with experience in training new police officers in "standardized procedures for conducting investigations, including those related to assault and domestic violence." *Id.* at 5 (capitalization removed). He emphasizes that "[t]he

---

[1] The only case law and statutes Hicks is familiar with are federal and state case law and statutes; he has not reviewed Lummi's tribal code or case law from tribal court. Rough Tr. 16, 55, 59.

WSCJTC curriculum is designed to adhere to the general law enforcement standards and best practices applicable throughout the state of Washington." *Id.*

But Hicks' limited experience does not support his sweeping assertion that "general law enforcement standards" govern all law enforcement officers in Washington. Although Hicks possesses some FEMA certifications, Dkt. No. 161-3 at 4, the record does not indicate that he otherwise has any experience with federal law enforcement investigations. And again, Hicks has no education, training, or experience in tribal law enforcement other than his limited experience with the Puyallup Tribe. He also did not research Lummi Nation laws governing domestic violence or police practice and procedure to determine whether they conflicted with these supposedly universal procedures. Rough Tr. at 55. The Court further notes that the Washington State Criminal Justice Training Commission course that Hicks taught "provides instruction on the Washington Model of Policing" and is mandatory for city and county officers but not tribal police, WSCJTC, Basic Law Enforcement Equivalency Academy, https://cjtc.wa.gov/training-education/basic-law-enforcement-equivalency-academy, and its curriculum focuses on state law, Wash. Admin. Code § 139-05-250. *See also* Rough Tr. 31 ("Since the history of the Washington State Criminal Justice Training Commission in 1974, the goal was to get all of the police officers *that are enforcing state law* to be on the same page, to have consistent professional training for the citizens." (emphasis added)). As discussed below, state law does not apply to this case as a matter of law.

With his limited experience outside state law, Hicks has no foundation upon which to suggest that there is such a thing as one-size-fits-all "general law enforcement standards" among state, federal, and tribal law enforcement in Washington. Indeed, the Supreme Court has recognized that "local law enforcement practices—even practices set by rule. . . . 'vary from place to place and from time to time.'" *Virginia v. Moore*, 553 U.S. 164, 172 (2008) (quoting *Whren v. United States,* 517 U.S. 806, 815 (1996)). Hicks' broad and sweeping pronouncements that his

opinions follow generally accepted police practices amount to nothing more than his own *ipse dixit*. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ([N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) ("In the *Daubert* context," attempts by an expert "to anoint his opinions by claiming that he based them on the 'broad principles of pharmacology' . . . . have little value. They are not shibboleths that distinguish those experts that offer reliable science from those who foist junk science on the court."); Fed. R. Evid. 702, Advisory Committee's Notes to 2000 amendments ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"). This one-size-fits-all approach would substitute "police enforcement practices," which "vary from place to place and from time to time," for the actual federal or tribal standards that applied to Lummi law enforcement's conduct, which are not "so variable." *Virginia*, 553 U.S. at 172. Accordingly, Hicks' opinions based on "law enforcement accepted industry standards" are unreliable and inadmissible, and he may not rely on these amorphous standards as a gauge for assessing Lummi Nation law enforcement's investigation here. *See Nelson v. Thurston Cnty.*, No. C18-5184-RSL, 2022 WL 4652376, at *3 (W.D. Wash. Sept. 30, 2022) (expert opinion based on "well-established police procedures, standards and norms" or "standard procedural training" not admissible).

### (c) Officer Granger's Training and "Washington State Standards" (Section B of the Initial Report)

In Section B, Hicks primarily describes Officer Granger's training as a Washington Peace Officer and the related Washington state standards. Dkt. No. 161-2 at 8. Hicks adds that he was the "lead instructor and manager of [the Basic Law Enforcement Equivalency Academy] during

Officer Granger's attendance." *Id.* He also states that Officer Granger graduated from the United States Indian Police Academy in December 2018. *Id.*

The Court will address the reliability of specific opinions below, but finds as a general matter that opinions based on Washington state law or training, or Hicks' experience with the same, are not reliable. Lummi Nation is not governed by state law, and state law does not apply to the subject crime in this case. Only federal and tribal law apply to Indian-on-Indian crimes in Indian Country absent Congressional authorization for state law to apply. *See* 1 F. Cohen, Handbook of Federal Indian Law § 7.04 (2024); *McGirt v. Oklahoma*, 591 U.S. 894, 898 (2020).[2] Because Hicks does not have any expertise in, or baseline knowledge of, what laws apply to tribes (or when they apply), Rough Tr. at 50, 57; *see also id.* at 16–17 (stating incorrectly that federal law is "universal throughout the country" and would apply to tribes), and did not research the Lummi Code of Laws to determine if any laws or policies conflicted with state law or training, *id.* at 55, his assessment that tribal officers' non-compliance with state law and state training demonstrates their non-compliance with *applicable* standards (i.e., tribal law, tribal training, and tribal policy) is not reliable. Therefore, compliance with Washington state law and state law-based training is not an appropriate metric by which to evaluate the adequacy of Officer Granger's (or any Lummi law enforcement officer's) investigation in this case. *United States v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012) (approving district court's exclusion of expert analysis that conflicted with applicable law); *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible. . . . They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact.").

---

[2] Congress has not authorized state law to apply to the alleged crime in this case. *See* Pub. L. No. 83-280, 67 Stat. 588, 18 U.S.C. § 1162, 28 U.S.C. § 1360; Wash. Rev. Code § 37.12.010.

Hicks also may not testify that he was Officer Granger's instructor. This is not the province of expert testimony and Hicks has not been offered as a dual role witness (nor has the defense proposed any jury instructions to that effect). *Holguin*, 51 F.4th at 851 (dual-role testimony can give a witness "unmerited credibility" and confuse jurors). Furthermore, the training Hicks provided to Officer Granger was on state law enforcement, which is inapplicable and therefore irrelevant to this case.

### (d) Exculpatory Information and Report (Section C of the Initial Report)

Hicks' first substantive opinion is that Officer Granger and other members of Lummi Nation law enforcement "omitted critical exculpatory evidence from their official written documentation" which "significantly impacted the trajectory of the investigation, leading to the subsequent arrest and pending prosecution of Joseph Jefferson. Such actions are fundamentally incompatible with established police training and procedures." Dkt. No. 161-2 at 9.

For the reasons stated above, the Court finds this opinion unreliable and irrelevant to the extent it relies on state training and state law. *See id.* at 9–12, 14–15; *see also, e.g.*, *id.* at 14 ("[Doe's] possession of a knife prior to the alleged assault is crucial to determining the sequence of events and identifying the primary aggressor, as mandated by RCW 10.31.100."); *id.* at 24 ("[T]he investigation deviated from the basic training of RCW 10.31.100, which *mandates* officers to arrest the individual they believe to be the primary aggressor."). Although a jury may assess the quality of law enforcement's investigation because it can bear on officer credibility and the weight to be given to evidence produced by his investigation, *Kyles v. Whitley*, 514 U.S. 419, 446 n.15 (1995); *United States v. Yagman*, 345 F. App'x 312, 314 (9th Cir. 2009); *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000), Lummi officers' failure to comply with state training or state law does not make it more or less likely that the investigation did not comply with *applicable* law, training, or policy. *See Tanberg v. Sholtis*, 401 F.3d 1151, 1163–64 (10th Cir. 2005). In other

1    words, testimony regarding law, training, and/or policy that is inapplicable to this case is not

2    relevant, and instead risks misleading the jury and confusing the issues. *United States v. Aegis*

3    *Therapies, Inc.*, No. CV 210-072, 2015 WL 1541491, at *8–9 (S.D. Ga. Mar. 31, 2015) ("By

4    repeatedly using a standard . . . that is decidedly at odds with the actual governing standard,

5    Plaintiffs' experts' analysis and conclusions rest upon repeated and erroneous evaluations," which

6    are not helpful to the jury and "could confuse or mislead the jury.").

7         Additionally, this section of the report impermissibly speculates at points and provides

8    argument beyond the scope of proper police practices expert testimony. These statements are also

9    not admissible. Dkt. No. 161-2 at 9 ("These omissions [of exculpatory evidence from official

10   documentation] significantly impacted the trajectory of the investigation, leading to the subsequent

11   arrest and pending prosecution of Joseph Jefferson."). And any portions of Hicks' testimony in

12   this section that rely on unidentified standards are inadmissible too. *Nelson*, 2022 WL 4652376, at

13   *3. This includes testimony referring to "standard police practices," "basic police training," and

14   "established policing standards." Dkt. No. 161-2 at 15.

15        Furthermore, Hicks' opinion that a witness's "repeated interjections during Granger's

16   interview with [Doe] were highly improper" has no discernible basis. Dkt. No. 161-2 at 15. Hicks'

17   experience and education in state law and state training does not provide an adequate basis for this

18   opinion for the reasons stated above. *Nelson*, 2022 WL 4652376, at *3. This opinion is excluded

19   as unreliable.

20        The Court finds that only the opinions about requirements based on Lummi police *Brady*

21   and report-writing policies are relevant. Dkt. No. 161-2 at 11–13. Hicks sufficiently describes the

22   relevant Lummi policies and connects them to his underlying opinion. Thus, Jefferson has shown

23   by a preponderance of the evidence that these opinions (but not others in this section) are reliable

24   and relevant.

*(e)  Search Warrant and Probable Cause Affidavit (Section D of the Initial Report)*

In this section, Hicks concludes that "Officer Granger's preparation of the search warrant and probable cause affidavit significantly departed from basic training protocols and generally accepted police practices." Dkt. No. 161-2 at 16. The basis for this opinion is state law police training. *Id.* As noted above, even if Officer Granger or other members of Lummi law enforcement received this training, Hicks has no reliable basis to assert that state law and state training are applicable to this case, so state law police training is not an appropriate metric by which to judge Lummi officers' actions here.

Here again, the report impermissibly speculates that omission of mention of the knife "has likely altered the trajectory of the investigation and certainly compromised the evaluation of Jefferson's self-defense claim." Dkt. No. 161-2 at 17. This testimony is not admissible.

Finally, as with the prior section, any portions of this section of Hicks' report that rely on undisclosed standards are also inadmissible. *Nelson*, 2022 WL 4652376, at *3. This includes opinions referring to "fundamental police training," "basic training protocols," and "established police standards." Dkt. No. 161-2 at 17–18.

In sum, Jefferson has failed to show that it is more likely than not that the testimony in this section of Hicks' report is relevant and reliable under Rule 702.

*(f)  Domestic Violence Investigation (Section E of the Initial Report)*

Next, Hicks concludes that Officer Granger's and Lummi law enforcement's "omission of investigating the primary aggressor constitutes a substantial deviation from fundamental police training principles and the established standards expected of Washington State law enforcement officers." Dkt. No. 161-2 at 24. Here, he relies on Washington state law and training as well as LNPD Policy Manual sections on evidence collection. *Id.* at 19–24.

The Court finds that Hicks' opinion here is unreliable to the extent it relies on state law and state training. *Id.* at 19–25. As explained above, Washington state law and training are not an appropriate basis for an opinion on the adequacy of a tribal law enforcement investigation.

Although the portion of Hicks' opinion on evidence collection does cite some LNPD Policy Manual sections, it generally reproduces the policies without much, if any, analysis. *Id.* at 25–26. As it relates to the LNPD Policy Manual sections, the opinion misquotes a portion of the Manual, then details certain pieces of evidence that were not collected, and makes speculative statements about their importance. *Id.* at 25 (the "Lummi Nation Police policy explicitly states that officers shall 'preserve and collect any evidence'"); *see also id.* at 23 (actual quote: "the officer shall: (a) Preserve the scene and any evidence as required to complete the initial and follow up investigation" and "(e) Collect any evidence"). For example, Hicks concludes that "it is imperative to note the absence of follow-up photographs documenting [Doe's] purported injuries. . . . [S]uch documentation would have been invaluable in determining the extent of the alleged assault and assisting in the prosecution." *Id.* at 25–26. He also concludes that "the failure to obtain any evidence at the crime scene, significantly hindered the ability to verify or disprove the allegations, severely compromising Mr. Jefferson's defense against these serious charges." *Id.* at 25. These statements are speculative and argumentative, and thus outside the scope of proper expert testimony. The remaining permissible opinions from this portion of Section E are that (1) officers did not collect the knife contrary to Lummi police policy stating that officers shall "[p]reserve the scene and any evidence as required" and "[c]ollect any evidence"; (2) Officer Granger's search warrant did not include any steps to identify, preserve, or collect potential evidence; and (3) Officer Granger did not take photographs despite noting that such follow-up was required. *Id.* at 23, 25–26.

Finally, the last portion of this opinion, the "failure to document spontaneous statements" is unreliable. Dkt. No. 161-2 at 26. Hicks provides no basis for this opinion other than "basic police training and established police standards" and "standard training protocols[.]" *Id.* at 27. Similarly, unsubstantiated comparisons, such as comparing Officer Granger's conduct to FBI Agent Leavitt's, are excluded. *Id.*; *Nelson*, 2022 WL 4652376, at *3 ("[O]pinions based on undisclosed standards and unsubstantiated comparisons are *ipse dixits*, requiring the jury to accept the assertions as true simply because [the expert] said them."). Additionally, recitations of the facts to contextualize an opinion are appropriate, but expert testimony cannot be used to highlight certain facts for their own sake, or to editorialize, as Hicks does at times in the report. *Alves v. Riverside Cnty.*, No. EDCV 19-2083-JGB (SHKx), 2023 WL 2983583, at *11 (C.D. Cal. Mar. 13, 2023); *see, e.g.*, Dkt. No. 161-2 at 26 ("Officer Granger, *acknowledging the gravity of this statement*, again asked Jefferson if he wished to invoke his right to remain silent." (emphasis added)).

For the reasons laid out above, Jefferson has failed to show by a preponderance of the evidence that the testimony in this section of Hicks' report is relevant and reliable under Rule 702, with the exception of his testimony that (1) officers did not collect the knife contrary to Lummi police policy stating that officers shall "[p]reserve the scene and any evidence as required" and "[c]ollect any evidence"; (2) Officer Granger's search warrant did not include any steps to identify, preserve, or collect potential evidence; and (3) Officer Granger did not take photographs despite noting that follow-up to do so was required. Dkt. No. 161-2 at 23, 25–26.

### (g) Police Culture (Section F)

The last section of Hicks' report discusses police culture. It is unclear whether Hicks actually offers an opinion on police culture, as opposed to introducing a "discussion." This section of the report contains more questions than it does opinions. *See, e.g.*, Dkt. No. 161-2 at 30 ("Officer Granger should be asked about . . ."); *id.* ("Officer Granger should clarify . . ."); *id.* ("I am curious

to know if . . ."). Even if this discussion on police culture is offered as an opinion, Hicks offers no

reliable basis to opine on the import of the beatings-will-continue sticker in the tribal law

enforcement context. His "one-size-fits-all" approach characterizing the "culture of law

enforcement" as homogenous, Dkt. No. 182-1 at 8, rings hollow in light of the starkly different

historical and cultural context surrounding tribal law enforcement. *See* Alex Treiger, *Thickening

the Thin Blue Line in Indian Country: Affirming Tribal Authority to Arrest Non-Indians*, 44 Am.

Indian L. Rev. 163, 170–79 (2019); Kevin K. Washburn, *Federal Criminal Law and Tribal Self-

Determination*, 84 N.C. L. Rev. 779, 790–822 (2006). Hicks has no experience with tribal law

enforcement culture, nor did he make any attempt to investigate it. Rough Tr. at 49–50.

   In the end, all Hicks offers is speculation that the "disturbing" sticker has "potential

negative connotations." Dkt. No. 161-2 at 30. Jefferson has failed to meet his burden to show that

this section of Hicks' testimony is more likely than not relevant and reliable.[3]

   *(h) Conclusion*

   Hicks' initial report ends with the conclusion that "[t]he actions of the Lummi Nation

Police Department in this case exhibit a disturbing pattern of conduct that is fundamentally

incompatible with both foundational police academy instruction and established Washington State

law enforcement standards." *Id.* at 31. Nowhere in his report did Hicks explain why he felt it

appropriate to base his opinion on state law and state training. Instead, he simply assumed

(incorrectly) that state law and state training were applicable to tribal law enforcement officers

investigating an Indian-on-Indian crime in Indian Country. This only highlights his lack of

---

[3] The Court further notes that this type of expert testimony impermissibly attempts to establish witness motive or state of mind, *Est. of Casillas v. City of Fresno*, No. 1:16-CV-1042 AWI-SAB, 2019 WL 586747, at *8 (E.D. Cal. Feb. 13, 2019), and also fails to pass muster under Federal Rule of Evidence 403 because "its probative value is substantially outweighed" by the danger of unfair prejudice, confusion of the issues, and misleading the jury, Fed. R. Evid. 403. *See, e.g.*, Dkt. No. 161-2 at 30 ("Officer Granger should clarify whether the 'beatings' idiom was intended as a statement of frustration of the criminal justice system in general or as a specific reference to individuals arrested, such as Mr. Jefferson.").

experience and knowledge regarding tribal law enforcement; tribal law and policy; and the jurisdictional limits of tribal, state, and federal law enforcement authority. As explained above and below, his supplemental reports do not salvage his faulty assumption that state law applies or is otherwise relevant.

### (i) Second Supplemental Report

In his second supplemental report, Hicks seeks to establish that state law and state training are a reliable basis for his opinion because "LNPD's Domestic Violence policies are firmly grounded in the statutory framework of the State of Washington, specifically the Revised Code of Washington." Dkt. No. 182-2 at 3. Hicks highlights several portions of the LNPD Policy Manual's domestic violence provisions that "include direct references to the relevant sections of the Revised Code of Washington." Dkt. No. 182-2 at 4–5; *see also* Dkt. No. 131-2 at 2–8.

This opinion is fatally flawed. Although portions of the LNPD Policy Manual's Domestic Violence section cross-reference Washington law, Hicks did not cite to or rely on the Domestic Violence section at all in his initial report. *Compare* Dkt. No. 161-2 at 11–13, 22–23 (citing LNPD Policy Manual §§ 322.1, 322.1.1, 600.1, 600.2, 600.3, 600.3.1, 604.1, 604.1.1, 604.2, 604.3), *with* Dkt. No. 182-2 at 4 (citing LNPD Policy Manual §§ 310.1.1, 310.9, 310.10). The first time he cites the Domestic Violence section is in his supplemental report. *See* Dkt. No. 182-2 at 3–5. Notably, none of the LNPD Policy Manual sections upon which Hicks relied in his first report reference the Revised Code of Washington. Dkt. No. 161-2 at 11–13, 22–23; 2023 LNPD Manual at 174, 387, 410; Dkt. No. 131-2 at 9–13, 16–24.

The initial report's lack of citations to the LNPD Policy Manual's Domestic Violence section suggests that Hicks formed his opinion based on state law first, and then only afterward sought to justify his reliance on state law by referencing Lummi police domestic violence policies. In other contexts, courts have rejected this sort of post-hoc rationalization. *See, e.g.*, *Haller v.*

*AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1297 (M.D. Fla. 2009) (expert opinion excluded where "reached his initial conclusions prematurely . . . then later gathered what additional information he could to shore up his initial opinions"); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 560 (S.D.N.Y. 2008) (excluding testimony because "it appears [the expert] is reaching his conclusion first . . . and then providing whatever reasons are necessary to support it"). Thus, whether or not Lummi's domestic violence police policies are "based on" Washington state law, Hicks formed his opinion without reference to those policies, and his reliance on state law is therefore not a proper basis for his opinion.

There are other, independent reasons for rejection Hicks' post hoc rationalizations, discussed below.

1. Interspersed references to the Revised Code of Washington in the LNPD Policy Manual and wording similar to various local police policies is an insufficient basis upon which to sweepingly conclude that the LNPD Policy Manual's Domestic Violence section "is Based on the Revised Code of Washington." Dkt. No. 182-2 at 3. First, similar wording between state and/or local laws and tribal laws do not render the state or local laws applicable to the tribe or indicate that the tribe intended such result. *Tom v. Sutton*, 533 F.2d 1101, 1104 n.5 (9th Cir. 1976) (holding that terms in the Indian Civil Rights Act that are identical to those in the Bill of Rights "are not always given the same meaning as they have come to represent under the United States Constitution"). Second, that an Indian tribe cross-references certain laws of a state in its police manual does not mean that the tribe intends that those laws, or other state laws, apply to it (or its police force). For example, in *Tom*, the Ninth Circuit held that the Lummi Constitution's requirement that "[n]o member shall be denied any of the rights or guarantees enjoyed by non-Indian citizens under the Constitution of the United States" did not necessarily mean that criminal defendants had the right to counsel; the Lummi Constitution had also adopted the Indian Civil

Rights Act's provision permitting counsel at the defendant's own consent. *Id.* at 1105. Here, as in *Tom*, consideration of controlling law (discussed below) makes it clear that there is no basis to conclude that the LNPD Policy Manual's isolated references to the Revised Code of Washington render state law (or state law enforcement training) applicable or otherwise relevant to the circumstances of this case.

2. Hicks is not qualified to offer an opinion on what law the LNPD Policy Manual is "rooted in." Hicks has no substantive experience or education in tribal law (including the LNPD Policy Manual) or construction of tribal law, did not research the Lummi Constitution or Code of Laws in preparing his opinions, and is not familiar with the Lummi Nation or its Police Department in particular. At bottom, his opinion that the LNPD Policy Manual's domestic violence section is "based on" state law "rests upon unsubstantiated generalizations, speculative hypotheses and subjective evaluation that are based neither upon any professional study or experience-based observation." *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 183 (E.D.N.Y. 2001).

3. Hicks' conclusions contradict the law. As explained above, Indian tribes are not governed by state law absent Congressional authorization to the contrary, nor can tribes enforce state law. However, tribal officers can be cross-deputized, meaning that they are effectively authorized to act as law enforcement officers for another sovereign *when that sovereign's law applies*. In Washington State, the Interlocal Cooperation Act, Chapter 39.34 of the Revised Code of Washington, authorizes public agencies to contract with other public agencies, including federally recognized Indian tribes, to perform governmental activities. Pursuant to this authority, many tribes, including the Lummi Nation, have executed interlocal agreements with counties under which tribal officers can be cross-deputized as state law enforcement officers. Such cross-deputization is governed by Section 10.92.020 of the Revised Code of Washington, which provides that "[t]o be authorized as a general authority Washington peace officer, a tribal police officer must

1  successfully complete the requirements set forth under RCW 43.101.157." Wash. Rev. Code §

2  10.92.020(2)(b). Section 43.101.157 requires that tribal law enforcement comply with all of the

3  requirements for certification applicable to state peace officers certified by the Washington State

4  Criminal Justice Training Commission. Thus, Washington State Criminal Justice Training

5  Commission training is required before a tribal officer can act as a state officer—again, *when state*

6  *jurisdiction applies*.

7      In July 2020, the Lummi Nation and Whatcom County executed an Interlocal Cooperative

8  Act Agreement under which "Authorized Tribal Officers"—i.e., Lummi Nation police officers

9  who have complied with Section 10.92.020's requirements—can "exercise the powers of a

10 [Washington State] general authority police officer[.]" *See* Interlocal Cooperative Act Agreement

11 Between the Lummi Nation and Whatcom County (the "Agreement"), available at

12 https://documents.whatcomcounty.us/WebLink/PDF10/e5ad5f76-2c2b-477f-9c0a-

13 be51c723698d/4616669;[4] *see also* Wash. Rev. Code § 10.92.020(1) ("A tribal police officer

14 recognized and authorized to act as a general authority Washington peace officer under [Section

15 10.92.020] has the same powers as any other general authority Washington peace officer to enforce

16 state laws in Washington, including the power to make arrests for violations of state laws."). The

17 Lummi Nation authorized the Agreement "in order that LNPD officers be clothed in the *authority*

18 *to enforce state . . . law against non-tribal offenders* located within the exterior boundaries of the

19 Lummi Nation's reservation and upon the Nation's trust lands." *Id.*, LIBC Resolution 2020-069 at

20 2 (emphasis added). The Agreement sets forth two bases for the exercise of police authority—state

21 law when the officer is enforcing state law, and tribal and/or federal law when the officer is

22 enforcing that law:

23

24 [4] The Court takes judicial notice of the Agreement. *King v. Cty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018).

ORDER ON ADMISSIBILITY OF DEFENSE EXPERT RUSS HICKS' TESTIMONY - 20

> Any Lummi Nation Police Officer issuing any Notice of Infraction, issuing any criminal citation, making any arrest, or completing any incident report while acting in the capacity of a general authority Washington peace officer pursuant to this Agreement is responsible for filing any required notice and citations with the appropriate Washington State court or as directed by the County Prosecuting Attorney. Any citation or infraction issued by the Lummi Nation Police Officer within the exterior boundaries of the Lummi Reservation pursuant to the Lummi Nation Police authority under federal and/or tribal law will be cited to Federal and/or Lummi Tribal Court.

Agreement ¶ 16. Furthermore, "[a]ny investigation, warrant, or arrest undertaken under state law authority pursuant to this Agreement must be undertaken in accordance with applicable state or federal law." *Id.* ¶ 17. In other words, if (for example) officers are called to a home on the reservation where a crime has been committed by a non-Indian against a non-Indian, the tribe does not have jurisdiction and the Lummi officer thus exercises his authority as a Washington state officer, requiring him to abide by applicable state law. *See* 1 F. Cohen, Handbook of Federal Indian Law § 11.03 (2024). On the other hand, if (for example) the crime has been committed by an Indian against an Indian, the officer exercises his authority under tribal law and is not required to abide by state law. *See id.* § 11.04.

As part of the Agreement, Lummi Nation and Whatcom County agreed on "Law Enforcement Operations and Response Protocols." *Id.* Appendix A. Under these Protocols, the Lummi Nation Police Department is "the primary law enforcement agency for all statutory and common law violations of state law *committed by a non-Indian*, within the exterior boundaries of the reservation of the Lummi Nation and upon Lummi trust land." *Id.* (emphasis added). The Agreement did not expand the application of state law on the Lummi reservation, nor did it alter the applicability of tribal and federal law on the reservation. *See* Agreement, ¶¶ 7, 8, 11.

The tribal resolution approving the Agreement noted that Lummi Nation had consented to "Washington state certification of LNPD officers at the Washington State Criminal Justice

Training Center" in a prior resolution. *Id.*, LIBC Resolution at 1.[5] Officer Granger completed the

Washington State Criminal Justice Training Commission's Basic Law Enforcement Equivalency

Academy in January 2020. Dkt. No. 161-2 at 8 n.2.

Because tribal law enforcement *cannot* enforce state law where, as here, state jurisdiction

is lacking, the LNPD Policy Manual's references to the Revised Code of Washington would have

immediately alerted a person knowledgeable about these jurisdictional limitations to investigate

further. The references to the Revised Code of Washington in the LNPD Policy Manual's

Domestic Violence section do not demonstrate that state law applies where it cannot (i.e., Indian-

on-Indian crime in Indian Country). For example, Section 310.9(b) replicates the language in

Revised Code of Washington: "[w]hen an officer responds to a domestic violence call and has

probable cause to believe that a crime has been committed, he/she shall make an arrest pursuant to

the criteria in RCW 10.31.100[.]" Dkt. No. 182-2 at 4; Wash. Rev. Code § 10.99.030(2)(a). Section

10.31.100, in turn, provides that

> A police officer having probable cause to believe that a person has committed or is
> committing a felony shall have the authority to arrest the person without a warrant.
> A police officer may arrest a person without a warrant for committing a
> misdemeanor or gross misdemeanor only when the offense is committed in the
> presence of an officer, except as provided in subsections (1) through (11) of this
> section. . . .
> (2) A police officer shall arrest and take into custody, pending release on bail,
> personal recognizance, or court order, a person without a warrant when the officer
> has probable cause to believe that . . . .
> (d) The person is eighteen years or older and within the preceding four hours has
> assaulted a family or household member or intimate partner as defined in RCW
> 10.99.020 and the officer believes: (i) A felonious assault has occurred; (ii) an
> assault has occurred which has resulted in bodily injury to the victim, whether the
> injury is observable by the responding officer or not; or (iii) that any physical action
> has occurred which was intended to cause another person reasonably to fear
> imminent serious bodily injury or death. Bodily injury means physical pain, illness,

---

[5] The prior resolution, cited by Hicks (Dkt. No. 182-2 at 2 n.2), also states that it was executed "in order that LNPD officers be clothed in the authority to enforce state . . . law against non-tribal offenders located within the exterior boundaries of the Lummi Nation's reservation[.]" LIBC Resolution 2019-133 at 1 (Dec. 17, 2019), available at https://cjtc.wa.gov/sites/default/files/2024-06/lummi-nation-aa-2020-26-%2801-07-2020%29.pdf.

or an impairment of physical condition. When the officer has probable cause to believe that family or household members or intimate partners have assaulted each other, the officer is not required to arrest both persons. The officer shall arrest the person whom the officer believes to be the primary aggressor. In making this determination, the officer shall make every reasonable effort to consider: (A) The intent to protect victims of domestic violence under RCW 10.99.010; (B) the comparative extent of injuries inflicted or serious threats creating fear of physical injury; and (C) the history of domestic violence of each person involved, including whether the conduct was part of an ongoing pattern of abuse.

Wash. Rev. Code § 10.31.100. This is the only section of the Revised Code of Washington that Hicks cites in his initial report. Dkt. No. 161-2 at 14, 19 & n.15, 20–21, 24 & n.22. As a matter of law, this arrest authority *cannot* apply to Indian-on-Indian Crime in Indian Country. Instead, tribal arrest authority applies: specifically, Section 5A.02.030 of the Lummi Code of Laws governs the arrest of perpetrators of a crime of domestic violence. LCL § 5A.02.030, available at https://www.lummi-nsn.gov/website.php?PageID=831/. Section 100.3.1 of the LNPD Policy Manual, titled "Arrest Authority," acknowledges tribal officers' two different arrest authorities: "The arrest authority of the Lummi Nation Police Department includes: LCL 2.03.005 Arrest," and "[t]he arrest authority of the Lummi Nation Police Department includes (RCW 10.31.100) when applicable." 2023 LNPD Manual at 8. Hicks testified at the *Daubert* hearing that Lummi officers were exercising their arrest authority under Lummi law in this case, not under state law. Rough Tr. 51–52. However, he did not research provisions governing arrest authority in the Lummi Code of Laws. Rough Tr. 55.

Similar conflicts pervade the other citations that Hicks points to. *Compare, e.g.*, Dkt. No. 182-2 at 4 (citing manual references to Sections 10.31.100(2), 10.99.030, 10.99.055), *with* LCL §§ 5A.02.010, 5A.02.030, 5A.02.070). For example, the LNPD Policy Manual contains references to the definitions of "domestic violence" from sections of the Revised Code of Washington related to civil protection orders, Wash. Rev. Code § 7.105.010(8), and the criminal code, Wash. Rev. Code § 10.99.020(4). 2023 LNPD Manual at 108; Dkt. No. 131-2 at 2; Dkt. No. 182-2 at 4. But

the Lummi Code of Laws has a different definition of "domestic violence." LCL § 5A.01.040(c), available at https://www.lummi-nsn.gov/website.php?PageID=831/. Again, the latter definition would apply where, as here, state jurisdiction is lacking.

These issues underscore the importance of knowledge in tribal law, tribal law enforcement, and Indian Country jurisdiction in opining on the meaning of tribal law and policy. Because Hicks is unfamiliar with tribal jurisdiction, it did not occur to him that the Revised Code of Washington could be inapplicable as a matter of law to tribal law enforcement's actions. And although he acknowledged that it would be possibly important to know if the Lummi Code of Laws conflicted with the LNPD manual, he did not research or consider the Lummi Code of Laws in developing his opinions in this case. Rough Tr. 55–56.

For all these reasons, Jefferson has not shown to the Court that it is more likely than not that Hicks' opinions in his second supplemental report are reliable.

## II.   CONCLUSION

For the reasons stated above, with limited exceptions, Jefferson has not shown that it is more likely than not that the testimony of defense expert Russ Hicks meets the requirements of Rule 702 of the Federal Rules of Evidence. The Court has found the following opinions to be relevant and reliable:

- opinions about requirements based on Lummi police *Brady* and report-writing policies. Dkt. No. 161-2 at 11–13.

- opinions that (1) officers did not collect the knife contrary to Lummi police policy stating that officers shall "[p]reserve the scene and any evidence as required" and "[c]ollect any evidence"; (2) Officer Granger's search warrant did not include any steps

//

//

to identify, preserve, or collect potential evidence; and (3) Officer Granger did not take photographs despite noting that follow-up to do so was required. *Id.* at 23, 25–26.

Dated this 10th day of January, 2025.

Lauren King
United States District Judge